**Richmond**

JAMES MARTIN BROWN

v.

COMMONWEALTH OF VIRGINIA

No. 0043-84

Decided October 7, 1986

COUNSEL

Murray J. Janus; Fred A. Talbot (Bremner, Baber & Janus, on brief), for appellant.

W. Mark Dunn, Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

**BENTON, J.** — James Martin Brown was tried by jury and convicted of first degree murder of his wife. He contends on this appeal that the conviction should be reversed because (1) the evidence was insufficient to support the conviction, (2) the court erred in allowing the introduction of evidence concerning his relationship with two women, and (3) the court improperly admitted rebuttal evidence. We conclude that the introduction of evidence with respect to the women was prejudicial error and reverse the conviction.

We summarize the extensive evidence regarding the murder of Brown's wife, who died from stab wounds and was found lying inside the front door of their apartment. Police found a butcher knife in the dining room and a hunting knife in the hallway leading from the front door. Laboratory analysis of photographs indicated that a majority of footprints in what appeared to be blood conformed to athletic shoes belonging to Brown. On a chair beside the rear sliding-glass door police found two televisions, a clock radio, an automotive timing light and camera equipment. Ms. Brown's purse and briefcase were found at the end of the hallway near the kitchen; neither item gave any indication of having been disturbed. The purse contained loose change and eight or nine credit cards. Police found no identifiable fingerprints.

Brown was treated for a single wound on the front of his right thigh. He gave recorded statements to police which were played for the jury, and testified in his defense. Brown testified that he entered the apartment and saw a figure on the floor. He struggled briefly with an intruder who had a knife; they fell to the floor and Brown felt a sharp pain in his leg. The person then fled through the back door. The person wore gloves and what appeared to be a ski mask. It crossed Brown's mind that the person looked like his

son.

Brown placed a blue denim mask which he had constructed earlier in the day for a costume and his coveralls into a paper bag. Brown saw a pair of work gloves under a picnic table, placed them in the bag, and threw the bag over a fence surrounding a construction trailer. He testified that the action was taken in mental turmoil; he wanted to dispose of any evidence that might establish that his son had been in the apartment.

The police arrived before Brown could dispose of the hunting knife, which, he testified, looked like one his son had possessed. Brown initially withheld information about the mask and gloves because, he stated, when police arrived he had a "nagging question as to whether or not my son was involved." Brown contacted the police and told them about the bag after he had assured himself that his son was not involved.

Brown's son, who was at work on the night of February 16, 1984, testified to several disagreements with Ms. Brown, his stepmother, and to earlier attempts to break into the apartment and an adjacent apartment following psychiatric treatment. He once entered the apartment through a rear window because he had locked himself out. He said that the hunting knife found in the apartment was not similar to one he had owned.

Brown said on cross-examination that he loved his wife very much and was aware that she recently had designated him as beneficiary of a life insurance policy valued at approximately $100,000. He also admitted that he sent a post card to Jane Parker, a female acquaintance, in 1977, with the following inscription:

Hi There. Didn't get a chance to call you before I left — was in Washington for a week or so — Will call when I get back — Be Good. M

Brown also sent a Christmas card to Parker in 1976 with the preprinted message on the front: "To Someone Very Dear to Me." He did not recall giving Parker a bracelet as a gift; did not recall having invited Parker to his apartment, and denied telling her that he loved her. He testified that photography was his hobby and admitted taking a series of photographs of Parker.

Brown also admitted on cross-examination that he asked Judy Gibbs to lunch "probably earlier" than 1980 or 1981. He stated that he sent flowers to her trying to persuade her to permit him to photograph her. He denied that there was any type of relationship between them.

Ten witnesses said Brown had a good reputation for truth and veracity. Six witnesses, including Brown's in-laws and friends of both of the Browns testified to a happy marital relationship; two of these witnesses said that Ms. Brown had never complained about her marriage.

After argument by counsel and over Brown's objection, one of Ms. Brown's co-workers, Janice Carneal, testified on rebuttal that Ms. Brown had complained two weeks before the murder about her marriage. Jane Parker testified that Brown had given her a bracelet, told her on another occasion that he loved her, had invited her to his home in 1980 or 1981. She denied having sexual relations with him.

Brown was found guilty of first degree-murder and sentenced to life imprisonment. He contends that the cross-examination concerning Parker and Gibbs and the rebuttal testimony of Parker were remote and irrelevant. The Commonwealth on the other hand contends that the contested testimony was properly admitted "as supportive of a reasonable inference of marital discord" and was offered to rebut the evidence that the Browns had a happy marriage and to show that Brown had a motive to kill his wife.

 We begin with the view that in a prosecution for the murder of one's spouse the Commonwealth generally may introduce evidence of marital infidelity and may offer relevant evidence to show marital disharmony or to rebut evidence of marital bliss. However, in *Bunting v. Commonwealth*, 208 Va. 309, 157 S.E.2d 204 (1967) the Supreme Court said:

> Evidence which has no tendency to prove guilt, but only serves to prejudice an accused, should be excluded on the ground of lack of relevancy. For evidence to be admissible it must relate and be confined to the matters in issue and tend to prove an offense or be pertinent thereto. Evidence of collateral facts or those incapable of affording any reasonable

presumption or inference on matters in issue, because too remote or irrelevant, cannot be accepted in evidence.

*Id.* at 314, 157 S.E.2d at 208 (citations omitted).

We believe the evidence regarding Jane Parker and Judy Gibbs was so remote as to be irrelevant and served only to inflame and excite the passions of the jury and to mislead them. The question of remoteness involves determinations of time and circumstances and thus requires the exercise of discretion by the trial court. *See Trogdon v. Commonwealth,* 72 Va. (31 Gratt.) 862, 870-71 (1878).

The evidence establishes that sometime prior to 1980 Brown waited for Gibbs after work for an unspecified reason and that he sent flowers to persuade her to allow him to photograph her. There was no "relationship" established by this evidence and any inference drawn from these facts to support an illicit extramarital relationship would be based simply on speculation and conjecture.

The evidence regarding the existence of a relationship with Parker was not as speculative; but when the time frame is considered in relation to the circumstances proved, the inference to be drawn is just as tenuous. Brown sent Parker a Christmas card expressing endearment in 1976; he sent her a card in 1977 with an innocuous message; and he gave her a bracelet at an unspecified time prior to 1980. In addition, Brown photographed Parker in a variety of poses; none of the photographs manifest a sexual tone or even suggest a sexual relationship between photographer and subject. Although Brown denied having told Parker that he loved her or having invited her to his apartment in 1980 or 1981, Parker testified that he made both statements. She denied having sexual relations with Brown. There was no other evidence of a "relationship" and no evidence or suggestion that their "relationship" existed beyond 1980 or 1981.

We conclude that the innocuous and inconclusive nature of the evidence combined with the lapse of four to eight years between these incidents and the murder of Ms. Brown do not afford any "reasonable presumption or inference on matters in issue" and fail to provide a logical and natural connection to Brown's guilt. *Bunting,* 208 Va. at 314, 157 S.E.2d at 208.

Furthermore, we believe that the probative value, if any, of these incidents with respect to the quality of Brown's marriage, was substantially outweighed by the prejudice to Brown of admitting the evidence. The evidence linking him to the murder was entirely circumstantial. The evidence regarding Parker and Gibbs provided no material link in the chain of evidence; moreover, its tendency to appeal to the passions and prejudices of the jury far outweighed whatever marginal probative value it possessed. Such evidence might have caused the jury to decide the case on an improper basis. Brown's affection for Parker was not shown to be continuous, to have had a bearing on his marital relationship, or to have involved illicit conduct. The connection between isolated acts of kindness or affection shown toward a person of the opposite sex, and marital infidelity on the one hand or the murder of a spouse on the other is tenuous at best. However, when four to eight years have elapsed between the occurrences the connection becomes too attenuated to be either material or relevant. *See Commonwealth v. Burke*, 339 Mass. 521, 533-34, 159 N.E.2d 856, 864 (1959).

The evidence regarding Parker and Gibbs fails to show any substantial connecting link between the acts proved and the murder charged. Thus, we conclude that the probative value, if any, of this evidence is far outweighed by the prejudice to Brown and should not have been admitted. The Commonwealth argued for admissibility on the ground that the evidence "shows a motive," and suggests on this appeal that the evidence established an "extramarital relationship." We believe that the jury could have given this remote, inconclusive evidence the same weight as the Commonwealth assigned for admissibility; therefore, the admission was prejudicial to Brown. *See Bunting*, 208 Va. at 314, 157 S.E.2d at 208.

We note that the record demonstrates that the trial judge was doubtful as to the admissibility of the evidence and expressed reluctance to admit the evidence, stating: "There is some remoteness in these dates" and "It is a mite remote, that is my problem with it." However, he permitted the Commonwealth to introduce the cards Brown sent to Parker and to cross-examine Brown regarding the purported "relationships," apparently because the Commonwealth represented that Parker and Gibbs would testify that there were continuing "relationships" with Brown and that Parker

would testify as to "advances toward her." The judge overruled Brown's objections to this evidence, noting specifically "the proffer that this Jane Parker would also testify that this went on until 1981[,] [a]nd whether it broke off [and] apparently was renewed in 81."

Parker's testimony on rebuttal, however, was subject to the same objection (which the trial judge told counsel he would not have to make to save) of remoteness; moreover, her testimony contains neither evidence of a continuing "relationship" nor evidence of "advances" toward her. Gibbs did not testify.

We conclude that the evidence as to Parker and Gibbs should not have been admitted because of remoteness in time and because the nature of this evidence was inconclusive and speculative with respect to the issues sought to be established.

We do not decide the question of the sufficiency of the evidence; however, because the issue of the rebuttal evidence given by Janice Carneal may reoccur on retrial we believe it sufficient to state that Carneal's testimony was responsive to evidence offered by Brown's witness.

Accordingly, this case is reversed and remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*

Cole, J., and Duff, J., concurred.