## Salem

WILLIAM JEFFREY CANTRELL

v.

COMMONWEALTH OF VIRGINIA

No. 0062-87-3

Decided October 18, 1988

272

COUNSEL

John C. Lowe (Lowe & Jacobs, on brief), for appellant.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

## OPINION

**KOONTZ, C.J.** — William Jeffrey Cantrell was first indicted on April 19, 1982, for first degree murder and use of a firearm in the commission of murder. At the conclusion of the first trial, a mistrial was declared because the jury was unable to reach a verdict. Following Cantrell's second trial in May 1983, he was found guilty of first degree murder and use of a firearm in the commission of murder. On appeal, the Supreme Court of Virginia reversed and remanded for a new trial on those indictments. *Cantrell v. Commonwealth*, 229 Va. 387, 329 S.E.2d 22 (1985). On remand, because of pre-trial publicity, venue was moved to Russell County. Cantrell was convicted in the third jury trial of first degree murder and use of a shotgun in the commission of murder. In accordance with the jury's verdicts, Cantrell was sentenced to a total of twenty-three years' imprisonment.

On appeal, Cantrell raises the following issues: (1) whether he was placed in double jeopardy by being tried on a new indictment after the trial court granted a motion to *nolle prosequi* the first indictment; (2) whether the murder weapon and other items found near the body were illegally seized; (3) whether his statements to the police following the murder requesting return of a shotgun were inadmissible as the fruit of an allegedly improper search and seizure; (4) whether the trial court erred in admitting testimony concerning nude pictures of Cantrell's paramour and other evidence of Cantrell's extra-marital affairs; and (5) whether the evidence was sufficient to support the jury's verdict. Finding no error, we affirm the convictions.

### I. Factual Background

On December 8, 1981, at approximately 9:15 p.m., Judy Cantrell was killed by two shotgun blasts at her home as she returned from a karate class. Her husband, William Jeffrey Cantrell (hereafter Jeff Cantrell), was at home at the time. Mack Mullins, Jeff Cantrell's bother-in-law and neighbor, testified that around 9:00 p.m. he heard two loud "booms," which he thought were firecrackers. Ten or fifteen minutes later, Mullins received a call from

Bill Cantrell, his father-in-law and Jeff Cantrell's father, who asked whether Mullins had been shooting firecrackers. Bill Cantrell told Mullins that Jeff Cantrell had called reporting that someone had broken into his house and requesting that someone come and help. When Mullins arrived at the residence, Jeff Cantrell was holding his wife in his arms at the foot of five brick steps at the side of the residence. Mullins discovered a shotgun on a grassy landing near the top of the steps at the corner of the house. Near the shotgun was a knife and leather case and a spent shell casing.

Police Officer David Mullins received a call from the police dispatcher at approximately 9:18 p.m. and proceeded to Jeff Cantrell's residence. Officer Mullins testified he had been patrolling U.S. Route 23, the main highway near the residence and saw no vehicles parked on the shoulder of the road below the residence. A neighbor living on the road near Jeff Cantrell's residence testified she was home the night of the murder. She testified she could hear vehicles as they traveled down the gravel road because her house was a short distance from the road. She did not hear any vehicles travel the road that evening until around 9:05 p.m., when she heard a vehicle drive by her house. She looked out the window, which she customarily did when cars drove by, and saw the victim's car. The next vehicle she saw travel the road that night was the rescue squad.

When the police arrived at the scene at approximately 9:30 p.m., the rescue squad was already there. The victim was lying in the driveway at the bottom of the brick steps. Jeff Cantrell was lying behind the victim and was being attended to by rescue squad personnel. The police officer testified he saw a karate bag and sticks near the victim's feet and some keys lying on the steps. While viewing the body, Mack Mullins or Bill Cantrell said to the officer, "Come here. I want to show you the gun." Officer Mullins walked up the brick steps and found the shotgun on the grassy landing near the corner of the house, approximately six to eight feet from the entrance of the residence. Near the shotgun was a spent shell casing and a knife in a leather case. A second spent casing was still in the gun's ejector slot.

At about 9:35 p.m., the officer made a "walk through" in the house, while a fellow officer stood guard outside near the crime scene. The officer entered through the side entrance. The officer

saw a woman's purse on the pool table in the utility room. He proceeded through the utility room into the kitchen. The kitchen light was on. Numerous cabinet doors were open. A woman's wedding ring and birthstone ring were on the counter near the sink. Above the refrigerator, the open cabinet contained camera equipment. In the den, the officer noticed that the words "F___K YOU" had been written on the TV screen. The letter "K" was written in an unusual manner. The officer testified it looked like the letter "V" with a slash mark straight down in front of it. In a bedroom, the officer noticed that a number of Christmas presents had been opened. In the master bedroom, he observed women's clothing hanging out of opened dresser drawers. On top of the dresser lay two men's watches.

Cecil Bowling, a member of the rescue squad, testified concerning Jeff Cantrell's condition at the scene. Cantrell was hyperventilating and his blood pressure was "high;" however, Bowling did not recall seeing any bumps or bruises. On the way to the hospital in the ambulance, Bowling checked the reaction of Cantrell's pupils to light. He stated that Cantrell's eyes did not respond to the light. The attending emergency room physician testified that upon arrival, Cantrell was conscious, and his blood pressure was normal. Cantrell had sustained superficial scratches and some swelling of the forehead where he had a small bruise. X-rays were negative for any broken bones or a concussion. He was diagnosed as suffering from acute hysteria or a condition of extreme nervousness. The doctor prescribed valium intravenously. The following day, when Cantrell was released from the hospital, the swelling had gone and the cuts were almost cleared up.

Cantrell gave the police a list of items stolen from the residence, including flatware, $450 in currency, a clock, a movie camera, a .38 pistol, jewelry, a pocketknife, a hair dryer, Christmas presents, a plextron, a comb, money from his billfold, and a pocket watch.

On December 31, 1981, in a hand-written statement to police, Cantrell recited that, upon returning home at approximately 6:40 p.m., he entered the side entrance to the house without turning on the light in the room. He was entering the kitchen when he was struck over the head by a hard object. As he slumped, three persons grabbed him and forced him to the floor. He passed out and when he regained consciousness, his hands and legs were tied, he

was lying face down on the floor and a large man was sitting on his back. When he attempted to move, he was struck or slapped. He heard one of the three men coming down the hallway put shells in a shotgun. One of the intruders came into the kitchen, got a glass of water, and broke the glass on the back of Cantrell's head. None of the men spoke.

Cantrell heard his wife's car pull into the carport and he screamed, "Judy! Judy!" He was again hit over the head with a hard object. Shortly after this he heard a gun blast, and approximately three seconds later he heard a second gun blast. At this time the person sitting on him jumped up and the three intruders left after gathering the items they stole. Cantrell freed himself, hopped to the phone, turned on a light, and called his parents to get help. He went outside and found his wife lying at the foot of the steps leading to the side entrance.

On April 17, 1982, Officer Roy Nixon received an anonymous phone call from a person claiming to have been involved in the murder. Officer Donny Ray Mullins listened on the other line. The caller informed the police they would find evidence relating to the crime located in a flower box near the Pound Hardware Store. Officer Donny Ray Mullins, who had known Jeff Cantrell for fifteen or twenty years and had spoken to him on the telephone on previous occasions, testified that the caller was Jeff Cantrell and that the voice was "very similar" to Jeff Cantrell's. When the officers went to the flower box, they discovered a white plastic bag taped with yellow tape which contained a pistol similar to the one reported stolen by Cantrell. They also found a dark blue ladies' nightgown, a pair of pink panties, and two snapshots of the victim. A witness who went to high school with Jeff Cantrell testified that three days earlier on April 14, 1982, he had seen Cantrell run across the street near the Pound Hardware Store at 10:30 or 11:00 p.m.

Jeff Cantrell's paramour testified that she and Cantrell were involved in a sexual affair in 1981, just prior to the killing, and that they had broken off the relationship shortly after the killing. She testified that Cantrell admitted to her that he was involved with other women. Cantrell had taken nude photographs of her which he displayed to others, including the victim's brother. Cantrell had shown these nude pictures of his paramour to others in the fall of 1981. Randall Dean Donahue, Jeff Cantrell's cousin and one of

the persons to whom he showed the photographs, testified Cantrell stated that "if anything happened to mine and Judy's marriage, I would marry that woman." While testifying on direct examination, Cantrell admitted having had affairs with four women during his marriage. One such affair occurred about a year or two before his wife's death, and his affair with the paramour of whom he took pictures continued up until the time of the killing. Cantrell also admitted to Officer Donny Ray Mullins that he had been out with four women during the marriage.

Finally, in the summer of 1983, Jeff Cantrell discovered a number of letters and a card addressed to his wife hidden in the house. These letters appeared to be love letters from her paramour which were dated between July and October 1981.

## II. Double Jeopardy

We first address Cantrell's argument that the third trial was barred by the double jeopardy clause of the fifth amendment. Specifically, Cantrell argues that the prohibition of double jeopardy was violated when he was re-indicted and tried after a motion to *nolle prosequi* was granted over his objection prior to the beginning of the third trial.

Cantrell was first indicted and arraigned in 1982. At the arraignment, he pled not guilty. A jury was empaneled and sworn and jeopardy attached. The first trial resulted in a hung jury. Following retrial on the original indictment, he was convicted of first degree murder and use of a firearm in the commission of murder. The Supreme Court of Virginia reversed the conviction on appeal and remanded the case for further proceedings. A third trial was scheduled for August, 1985. Prior to the beginning of the third trial, which resulted in this appeal, Cantrell moved to dismiss the indictment with prejudice because it was purportedly "tainted" by prosecutorial misconduct. Rather than proceed to trial on a possibly defective indictment, and in an effort to cure possible error which may have been present, the Commonwealth's attorney moved to *nolle prosequi* the indictment, which motion the trial court granted.

Cantrell contends that because jeopardy had attached in the first trial, the Commonwealth's Attorney was required to demonstrate "manifest necessity" for discontinuance of prosecution, rei-

ndictment and reprosecution. He further agrues that because any potential defect in the original indictment was waived under Rule 3A:12 (now Rule 3A:9) when he pled to the indictment at arraignment in 1982, there existed no basis for granting the *nolle prosequi* motion. Therefore, Cantrell asserts discontinuation of prosecution, and the reindictment and the retrial following *nolle prosequi*, placed him twice in jeopardy for the same offense. We believe Cantrell confuses the requirement that the Commonwealth must establish "manifest necessity" before it may discontinue prosecution after jeopardy has attached with the grounds for the granting of a *nolle prosequi* motion. The Commonwealth must demonstrate "manifest necessity" for discontinuation of prosecution only after jeopardy has attached. For the reasons that follow, we hold that jeopardy had not yet attached and therefore Cantrell's reindictment and retrial was not barred by double jeopardy.

The fifth amendment's prohibition against double jeopardy applies to the states through the fourteenth amendment. *Benton v. Maryland*, 395 U.S. 784, 795 (1969). "[T]he double jeopardy clause applies in three distinct situations: 'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishment for the same offense.' " *Peterson v. Bass*, 2 Va. App. 314, 319, 343 S.E.2d 475, 478 (1986)(quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).

Cantrell cites *Crist v. Bretz*, 437 U.S. 28 (1978), and *Arizona v. Washington*, 434 U.S. 497 (1978), in support of his position. We believe such reliance is misplaced. In *Crist*, the Supreme Court decided whether the federal rule which provides that jeopardy attaches when the jury is empaneled and sworn is binding upon the states through the fourteenth amendment. The Court discussed the reasoning which underlies the rule establishing when jeopardy attaches and held that "[t]he federal rule that jeopardy attaches when the jury is empaneled and sworn is an integral part of the constitutional guarantee against double jeopardy" applicable to the states. *Crist*, 437 U.S. at 38.

In *Arizona v. Washington*, the trial judge declared a mistrial after the defendant's lawyer made improper and prejudicial remarks to the jury during his opening statement. On retrial, de-

fendant argued that he was being placed in jeopardy twice and could not be retried because a jury had been empaneled and sworn before a mistrial was declared. The Supreme Court held that retrial is not automatically barred when a criminal prosecution is terminated without resolution of the charges against the accused, and that if the prosecutor establishes "manifest necessity" for any mistrial declared over defendant's objection, double jeopardy would not prevent retrial. *Arizona v. Washington*, 434 U.S. at 505. There was no issue as to when or whether jeopardy had attached.

■ In the case before us, Cantrell had not been placed in jeopardy because a jury had not yet been empaneled and sworn at the third trial and the jeopardy which had previously attached had been dissipated. During the first trial, which resulted in a hung jury and mistrial, jeopardy had been dissipated. "Where the jury, after due deliberation, is unable to agree, and the court, in its sound discretion, dismisses the jury and declares a mistrial . . ., a plea of double jeopardy will not be sustained." *Miller v. Commonwealth*, 217 Va. 929, 933, 234 S.E.2d at 269, 272 (1977), *cert. denied*, 434 U.S. 1016 (1978)(citation omitted). The second trial resulted in a conviction which was reversed on appeal and remanded for further proceedings. The reversal was predicated upon the improper participation of a private prosecutor. *Cantrell*, 229 Va. at 392-94, 329 S.E.2d at 26-27. The Court did not address the sufficiency of the evidence.

■ "The Double Jeopardy Clause is not an absolute bar to successive trials. The general rule is that [it] does not bar reprosecution of a defendant whose conviction is overturned on appeal." *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 308 (1984). During preliminary proceedings in the third trial, Cantrell moved for dismissal of the indictment with prejudice prior to the empaneling and swearing of the jury. Thus, the jeopardy which had attached during the first two proceedings when the juries had been impaneled and sworn, but which had been dissipated or terminated by the mistrial in the first case and by reversal in the second, had not yet attached in the third trial.

■ The trial judge's decision to grant the Commonwealth's *nolle prosequi* motion was the result of Cantrell's motion to dismiss the indictment. He argued before the trial court that because of the "taint" on the original indictment, it should be dismissed.

Yet, he now argues before this court that because any defect of the indictment had been waived by his plea to the indictment and thus could not be grounds for dismissal, there was no "manifest necessity" requiring the termination of the criminal prosecution. We find Cantrell's argument disingenuous. In Virginia, a motion to *nolle prosequi* may be entered by a court, in its discretion, for good cause shown. Code § 19.2-265.3. "Under Virginia procedure a *nolle prosequi* is a discontinuance which discharges the accused from liability on the indictment to which the *nolle prosequi* is entered. For the prosecution to proceed thereafter with the same offense, a new indictment is required." *Miller*, 217 Va. at 935, 234 S.E.2d at 273 (citation omitted)(emphasis added). The Commonwealth's attorney argued that the motion to *nolle prosequi* should be granted so that he could correct any taint or irregularity on the indictments and prevent unnecessary error and potential reversal. Cantrell's trial counsel strenuously argued for dismissal with prejudice or alternatively that the case proceed to trial. He did not inform the court that any defect was waived under Rule 3A:12, nor did he agree to waive any objection. We assume his argument was in good faith. The trial court's decision to grant the *nolle prosequi* motion was out of concern for the possible "taint" on the indictment. The trial court did not want to "sit here for three or four days . . . trying the case that might be reversed for this particular reason . . . ." We do not address, nor do we decide, whether any alleged defect in the original indictment was waived. The trial judge's decision to grant the *nolle prosequi* was for good cause shown and within his discretion. Had the trial court not granted the motion, undoubtedly we would be faced today with the issue whether the "tainted" indictment requires dismissal.

We reject Cantrell's argument that the Commonwealth must show "manifest necessity" before a trial judge may terminate a criminal prosecution upon a motion to *nolle prosequi*. The Supreme Court held in *Crist* that once a jury has been empaneled and sworn, jeopardy attaches and unless "manifest necessity" for a mistrial is proven by the prosecutor, double jeopardy bars further prosecution. The jury had not been empaneled and sworn in Cantrell's case, and no mistrial was declared. Therefore the Commonwealth's attorney was not required to prove "manifest necessity" in support of his motion to *nolle prosequi*. The Commonwealth's attorney was merely required to show good cause, and the trial court, in its discretion, could grant the motion.

■ "It is generally recognized that a *nolle prosequi*, if entered before jeopardy attached, does not act as an acquittal and does not bar further prosecution for the offense." *State v. Cain*, 169 W. Va. 772, 776, 289 S.E.2d 488, 490 (1982). "When a defendant has been convicted and a new trial has been granted him, the prosecution may, with the consent of the trial court, enter a *nolle prosequi* without prejudice to a new indictment . . . ." *Id.* (quoting *State v. Burke*, 130 W. Va. 64, 72, 42 S.E.2d 544, 548 (1947)). "*Nolle prosequi*, if entered before jeopardy attaches, neither operates as an acquittal nor prevents further prosecution of the offense." *Bucolo v. Adkins*, 424 U.S. 641, 642 (1976)(per curiam)(applying Florida law). Had the Commonwealth moved for *nolle prosequi* after the jury was sworn (after jeopardy had attached), the Commonwealth would have been required to show "manifest necessity" to avoid the bar to further prosecution of double jeopardy. However, it is clear in this case that jeopardy had not yet attached because the jury had not been empaneled or sworn. Thus, the entry of a *nolle prosequi* did not bar reindictment and reprosecution.

### III. Suppression of Evidence

We turn next to Cantrell's contention that the shotgun, which undisputedly was the murder weapon, the spent shell casings and the knife should have been suppressed because they were purportedly illegally seized by the Commonwealth. These items were discovered near the victim's body, which was found at the foot of the brick steps at the side of the Cantrell's residence. The shotgun was found on a grassy landing near the corner of the house, a short distance from the body. The shell casings and knife were located within a few feet of the shotgun and body.

The police did not obtain a search warrant prior to searching Jeff Cantrell's residence. Numerous items were seized during the search. The trial judge suppressed the evidence seized by the police during their search inside the residence; other evidence discovered and seized outside the residence in the back yard area was also suppressed. However, the trial judge ruled that the items found in the vicinity of the victim, *i.e.*, the shotgun, spent shell casings, and knife, were admissible because they were seized pursuant to the plain view exception to the fourth amendment's warrant requirement. Cantrell argues there is no murder scene excep-

tion to the warrant requirement of the fourth amendment and that the seizure of the shotgun, shell casings and knife do not fall under the plain view doctrine. We agree there is no general murder scene exception to the warrant requirement. *Thompson v. Louisiana*, 469 U.S. 17, 21 (1984); *Mincey v. Arizona*, 437 U.S. 385, 394-95 (1978). However, we believe the evidence discovered by the police near the body of the murder victim, was in plain view and therefore subject to seizure.

 We begin with the cardinal principle that the fourth amendment proscribes all unreasonable searches and seizures and " 'searches conducted outside the judicial process, without prior approval of a judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.' " *Mincey*, 437 U.S. at 390 (1987)(quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception to the warrant requirement is the "plain view doctrine" established by the United States Supreme Court in *Coolidge v. New Hampshire*, 403 U.S. 443, 464-72 (1971).[1] "The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has the right to be." *Washington v. Chrisman*, 455 U.S. 1, 5-6 (1982). It "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)(citing *Texas v. Brown*, 460 U.S. at 738).

Our Supreme Court has recognized and applied this exception. *See, e.g., Delong v. Commonwealth*, 234 Va. 357, 362 S.E.2d 669 (1987), *cert. denied*, 108 S. Ct. 1100 (1988); *Blair v. Commonwealth*, 225 Va. 483, 303 S.E.2d 881 (1983); *Fitzgerald v. Commonwealth*, 222 Va. 615, 292 S.E.2d 798, *cert. denied*, 459 U.S.

---

[1] In *Texas v. Brown*, 460 U.S. 730 (1983)(plurality), then Justice Rehnquist stated that characterizing the plain view doctrine as an exception to the warrant requirement "may be somewhat inaccurate" because "plain view" provides grounds for seizure of an item when some prior justification under fourth amendment is already present. *Id.* " 'Plain view' is perhaps better understood, therefore, not as an independent 'exception' to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *Id.* at 738-39.

228 (1982); and *Lugar v. Commonwealth*, 214 Va. 609, 202 S.E.2d 894 (1974).

 The Supreme Court established the requirements for applying the plain view doctrine in its *per curiam* opinion in *Coolidge*. First, the police must have a prior justification for an intrusion. "Those circumstances include situations '[w]here the initial intrusion that brings the police within plain view of such [evidence] is supported . . . by one of the recognized exceptions to the warrant requirement . . . .'" *Arizona v. Hicks*, 107 S. Ct. 1149, 1153 (1987)(quoting *Coolidge*, 403 U.S. at 465). Simply put, "the officer must be lawfully in a position to view and seize the item." *Stokes v. Commonwealth*, 4 Va. App. 207, 209, 355 S.E.2d 611, 612 (1987). Second, the discovery of the evidence in plain view must be inadvertent.[2] "In order for the discovery to be inadvertent, the police may not 'know in advance the location of the evidence and intend to seize it.'" *Stokes*, 4 Va. App. at 211, 355 S.E.2d at 613 (*quoting Coolidge*, 403 U.S. at 470). The plain view doctrine may not therefore be used only as a pretext "to extend a general exploratory search from one object to another until something incriminating at last emerges." *Coolidge*, 403 U.S. at 466. "Finally, it must be 'immediately apparent' to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure." *Texas v. Brown*, 460 U.S. at 737 (citing *Coolidge*, 403 U.S. at 466). In *Arizona v. Hicks*, the Supreme Court held that probable cause was required to invoke the plain view doctrine. 107 S. Ct. at 1153. Thus, "the police must have had probable cause to believe that the evidence seized was a seizable item, i.e., contraband, the fruit or tools of a crime, or other evidence of a crime." *Delong*, 234 Va. at 365, 362 S.E.2d at 673.

---

[2] The "inadvertent discovery" requirment of the plain view exception to the warrant requirment has never been expressly adopted by a majority of the Supreme Court. *See Arizona v. Hicks*, 107 S. Ct. at 155 (White, J. concurring); *Texas v. Brown*, 460 U.S. at 737 (plurality). In *Brown*, the Court used this requirement as a "point of reference for further discussion of the issue." Our Supreme Court recognized that the "inadvertent discovery" prong of the plain view doctrine had not been expressly adopted in *Lugar v. Commonwealth*, 214 Va. 609, 612, 202 S.E.2d 894, 898 (1974). Later, in *Blair v. Commonwealth*, 225 Va. 483, 489, 303 S.E.2d 881, 886 (1983), our Supreme Court stated that "while not binding as a precedent, the plurality's discussion of 'plain view' has generally been followed in the lower courts." Our Supreme Court has therefore followed the "inadvertent discovery" requirement, as did this court in *Stokes v. Commonwealth*, 4 Va. App. 207, 209-11, 355 S.E.2d 611, 612-13 (1987). We, therefore, follow it here.

Applying these principles to the facts of the case before us, we hold that the items in question were in plain view and subject to seizure without a warrant. The police clearly had the right to be at the scene of the homicide, and under the exigent circumstances which existed, to search the area for intruders, other victims, or persons in need of assistance. Cantrell argues that the officer "could not have and did not see the items in the dark yard until he had trespassed onto the curtilage where he had no right to be."

> [T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person . . . is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search *of the area* to see if there are other victims or if a killer is still on the premises. "The need to protect and preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.

*Mincey*, 437 U.S. at 392-93 (citations omitted)(emphasis added). The police who seized the shotgun responded to an emergency call; they had the right to be on the premises and the right to search the area in the course of legitimate emergency activities. The fact that the items were in the dark is not constitutionally significant. *Texas v. Brown*, 460 U.S. at 740.

■ As to Cantrell's assertion that the discovery of the shotgun was not inadvertent because the officer walked onto the yard specifically for the purpose of being shown the shotgun by Mack Mullins, Jeff Cantrell's brother-in-law, we believe Cantrell miscontrues the inadvertence requirement. In *Coolidge*, the Court stated that "where discovery is anticipated and the police know in advance the location of the evidence, and intend to seize it," the discovery is not inadvert. 403 U.S. at 470. However, the Supreme Court explained in *Texas v. Brown* that the generalized expectation that evidence may be discovered does not violate the "inadvertence requirement" of the plain view doctrine. 460 U.S. at 743-44; *see also Stokes*, 4 Va. App. at 211, 355 S.E.2d at 613. The rationale underlying the inadvertence requirement is that a plain view seizure should not turn an initially valid, limited search

into a general one. *See Coolidge*, 403 U.S. at 470. In short, plain view should not become a pretext in which the police may look everywhere for evidence. The police did not go to Jeff Cantrell's residence for the purpose of seizing the shotgun, spent shell casings and knife. They responded to a call for assistance because a shooting had occurred. The police officers' legal entrance onto the Cantrell property was not a pretext for the search and seizure of the items in question. The police officers did not know in advance the location of the evidence and intend to seize it. The fact that Mack Mullins pointed out the location of the shotgun did not render its discovery inadvertent. Such an interpretation, as the Attorney General correctly argues, would preclude a warrantless seizure any time a person at the scene of a crime points out the location of the murder weapon to the police. We therefore hold that the items in the open yard near the victim's body were discovered "inadvertently" within the meaning of the plain view doctrine.

Finally, the police had probable cause to seize the weapon. They had ample reason to believe the shotgun was connected with the murder. The victim ostensibly was killed by a shotgun blast, and the shotgun shell casings and knife were discovered in close proximity to her body. The police therefore had probable cause to associate these items with criminal activity.

In summary, we hold that the elements of the plain view exception to the warrant requirement were met, the police lawfully seized the items in question, and the trial court properly ruled the items were admissible.[3]

## IV.

Cantrell next raises an issue closely related to the question whether the shotgun, shell casings and knife were admissible. Cantrell argues that his oral and written statements to the police identifying the shotgun as his and requesting its return should have been suppressed because they were fruits of the reputed illegal seizure of the shotgun. *See Wong Sun v. United States*, 371

---

[3] While it is not necessary to address because of our holding, we note that in his opening statement to the jury, counsel for Cantrell stated that the shotgun in question had been used by the alleged intruders to kill Cantrell's wife. Thus, no prejudice to Cantrell could have resulted from its admission in evidence.

U.S. 471 (1963); *Reese v. Commonwealth*, 220 Va. 1035, 265 S.E. 746 (1980). Because we hold that the shotgun was legally seized, we need not address whether the note written by the defendant to the police requesting his shotgun be returned was "fruit of the poisonous tree" and therefore illegally obtained.

## V. Suppression of Testimony

During the trial, certain testimony was allowed which disclosed adulterous activities by Jeff Cantrell. Cantrell challenges two groups of evidence introduced. First, he contends that the trial court erred when it allowed testimony that he took nude pictures of a woman with whom he was having an affair and displayed these photographs to friends. The pictures themselves were not displayed or admitted into evidence. Second, relying upon *Brown v. Commonwealth*, 3 Va. App. 182, 348 S.E.2d 849 (1986), he argues that testimony concerning his sexual affairs with other unspecified women should not have been allowed because it was remote, inconclusive, and speculative with respect to the issues sought to be established. Cantrell asserts that the prejudicial impact of this evidence outweighed its probative value, that it tended to establish him as a "bad person," and that it had an improper influence on the jury.

 "[I]n the prosecution for the murder of one's spouse, the Commonwealth generally may introduce evidence of marital infidelity and may offer relevant evidence to show marital disharmony or rebut evidence of marital bliss." *Brown*, 3 Va. App. at 185, 348 S.E.2d at 851. Cantrell concedes that evidence regarding the affair with the woman of whom he took pictures was admissible. Cantrell offered to stipulate to the existence of the affair and acknowledged in his opening statement that he had engaged in an extra-marital sexual affair. Consequently, he argues that testimony that he took nude pictures and displayed them to others was not probative of any disputed issue, and therefore was "not proof or corroboration of an affair." We disagree.

Evidence which has no tendency to prove guilt, but only serves to prejudice an accused, should be excluded on the ground of lack of relevancy. For evidence to be admissible it must relate and be confined to the matters in issue and tend to prove an offense or be pertinent thereto. Evidence of col-

lateral facts or those incapable of affording any reasonable presumption or inference on matters in issue, because too remote or irrelevant, cannot be accepted in evidence.

*Bunting v. Commonwealth*, 208 Va. 309, 314, 157 S.E.2d 204, 208 (1967)(citation omitted).

█ "Every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue, is admissible." *Epperly v. Commonwealth*, 224 Va. 214, 230, 294 S.E.2d 882, 891 (1982) (citing *Stamper v. Commonwealth*, 220 Va. 260, 269, 257 S.E.2d 808, 815 (1979), *cert. denied*, 445 U.S. 972 (1980)).

Cantrell's paramour testified that she had had an affair with Cantrell which continued up until the murder of his wife. The photographs which Cantrell had taken of this woman and displayed to his friends corroborated her testimony. This evidence was relevant to prove marital infidelity which can be considered to establish a motive for murder. Cantrell's willingness to stipulate that he had an affair did not prevent the Commonwealth from offering this testimony. *See Stamper*, 220 Va. at 271, 257 S.E.2d at 816.

*Brown v. Commonwealth*, upon which Cantrell relies, is readily distinguishable. There, a husband also maintained that his wife was killed by an intruder. Evidence was introduced that Brown had given gifts to two women four to eight years prior to this murder and that Brown had photographed one of them. There was no direct evidence of a sexual relationship between Brown and either of the women. In reversing Brown's conviction, we held that the evidence was too remote in time and was conjectural and speculative with respect to either marital infidelity or motive and was therefore irrelevant, prejudicial to Brown and thus inadmissible. In Cantrell's case, the evidence proved the existence of a sexual relationship which was not remote; rather it existed at the time of the murder and thus was probative of a motive for the murder.

Finally, Cantrell's contention that testimony concerning his affairs with other unspecified women should not have been allowed because it was inconclusive and speculative with respect to the issues sought to be established and thus its prejudicial impact outweighed its probative value, is without merit. The evidence of

these affairs came partially from Cantrell's sister and his own admissions. When coupled with the direct testimony of his paramour of that affair, the existence of the other affairs was no longer speculative or inconclusive and was relevant to prove the relationship between Cantrell and the victim in the recent past.

With regard to Cantrell's contention that the prejudicial impact of testimony concerning his affairs with other women outweights its probative value, our Supreme Court has said:

> [W]hen relevant evidence is offered which may be inflammatory and which may have a tendency to prejudice jurors against the defendant, its relevancy "must be weighed against the tendency of the evidence to produce passion and prejudice out of proportion to its probative value." . . . The responsibility for balancing these competing considerations is largely within the sound discretion of the trial judge. . . . And a trial court's discretionary ruling will not be disturbed upon appeal absent a clear abuse of discretion.

*Coe v. Commonwealth*, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986)(citations omitted).

■ The evidence was clearly relevant and probative of the issue of motive. Any prejudicial impact the evidence may have had on the jurors was inherent in the nature of the evidence itself. The Commonwealth is entitled to "introduce evidence of marital infidelity," *Brown*, 3 Va. App. at 185, 348 S.E.2d at 851, and in doing so some prejudice naturally results. In light of Cantrell's concession that evidence of one affair was admissible, and his testimony under direct examination that he had other affairs, took pictures of a paramour, and displayed these photos to his friends, we are unpersuaded that the probative value of this evidence was outweighed by its potentially prejudicial impact. "[S]ettled appellate criteria prevent us from declaring the [trial court's] ruling erroneous unless there has been a *clear* abuse of discretion . . . ." *Coe*, 231 Va. at 88, 340 S.E.2d at 823 (emphasis added). The trial court's obligation was to balance these competing considerations, and we cannot say that the trial court's ruling to allow this evidence constituted an abuse of discretion.

## VI. Sufficiency of Evidence

Cantrell argues that the purely circumstantial evidence established at least one reasonable hypothesis of innocence which was not excluded beyond a reasonable doubt. Cantrell's reasonable hypothesis of innocence consists of his explanation and statement that his wife was killed by intruders who had jumped him, ransacked his house and shot her when she came home. Cantrell argues that his version of the events was reasonable as a matter of law and was not excluded by the Commonwealth.

■ "On appeal, we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." *Martin v. Commonwealth*, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)(citing Code § 8.01-680). A judgment should be affirmed "unless it appears from the evidence that the judgment is plainly wrong and without evidence to support it." *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). We must "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Wright v. Commonwealth*, 196 Va. 132, 137, 82 S.E.2d 603, 606 (1954).

■ We agree with Cantrell's contention that, in a case based upon circumstantial evidence, the Commonwealth must exclude all *reasonable* hypotheses of innocence. *Stockton v. Commonwealth*, 227 Va. 124, 146, 314 S.E.2d 371, 385, *cert. denied*, 469 U.S. 873 (1984). However, "[w]hether the Commonwealth relies upon either direct or circumstantial evidence, it is not required to disprove every remote possibility of innocence, but is, instead, required only to establish guilt of the accused to the exclusion of a reasonable doubt." *Bridgeman v. Commonwealth*, 3 Va. App. 523, 526-27, 351 S.E.2d 598, 600 (1986)(citation omitted). "The Supreme Court of Virginia has not placed a burden on the Commonwealth to 'exclude every *possible* theory or surmise.'" *Amato v. Commonwealth*, 3 Va. App. 544, 554, 352 S.E.2d 4, 10 (1987).

We place too great a burden on the Commonwealth if we require it to exclude every possible theory or surmise presented by the defense. Our precedents do not require this. The hypotheses which the prosecution must reasonably ex-

clude are those "which flow from the evidence itself, and not from the imagination of defendant's counsel."

*Black v. Commonwealth*, 222 Va. 838, 841, 284 S.E.2d 608, 609 (1981)(citation omitted).

Cantrell is asking us to do what the jury, as evidenced by its verdict, and the trial court, as evidenced by its refusal to grant Cantrell's motion to strike and its refusal to set aside the verdict, saw fit not to do. Whether Cantrell's explanation for what happened on the evening of December 8, 1981, is a "reasonable hypothesis of innocence" is a question of fact. "[W]hat inferences are to be drawn from proved facts is within the province of the jury and not the court so long as the inferences are reasonable and justified." *Higginbotham*, 216 Va. at 353, 218 S.E.2d at 537. "The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide." *Bridgeman*, 3 Va. App. at 528, 351 S.E.2d at 601. "The jury was not required to accept defendant's statement as to how the killing occurred simply because defendant said that it happened in the way related by him." *Ward v. Commonwealth*, 205 Va. 564, 570, 138 S.E.2d 293, 298 (1964).

Reviewing the evidence in the light most favorable to the Commonwealth, it is clear that Judy Cantrell was murdered with her husband's shotgun. Jeff Cantrell was home at the time of the murder. The only evidence that others were present and perpetrated the killing was Cantrell's testimony that three intruders broke into his house, remained for over two hours, and then fled after killing his wife. A neighbor living on the road near Cantrell's residence testified she did not hear any vehicles travel the road on the evening in question until 9:05 p.m., when she saw the victim's vehicle pass. Officer Mullins testified he saw no vehicles parked on U.S. Route 23 below the Cantrell residence, the place where Cantrell suggested intruders might have parked while committing the crime.

Cantrell's claim that the intruders burglarized his residence is underminded by the fact that they left many items which were valuable and in plain sight and yet spent two hours burglarizing his home.

Furthermore, Cantrell's injuries were relatively minor given his account of the beating he allegedly suffered. The jury was entitled to disbelieve that three intruders entered the residence, waited for over two hours without speaking, killed the victim but not Cantrell, and then fled with nothing of substantial value.

Further evidence demonstrated that the "K" written on the television screen was written in a manner very similar to the way which Cantrell wrote his "Ks." A police officer identified the person calling the police station in April 1982 as Cantrell because of the similarity in the voices. A motive for the murder was established by Cantrell's testifying that he was engaged in extra-marital affairs, and he presented evidence that his wife also may have been engaged in extra-marital affairs before the killing. Thus, he had a motive to kill his wife because of his extra-marital affairs or those of his wife.

Upon review of the record, the evidence is sufficient beyond a reasonable doubt to support Cantrell's conviction of first degree murder and use of a firearm during the commission of murder. The jury had the right to reject Cantrell's explanation and testimony. "If from the improbability of [a defendant's] story and his manner of relating it, or from its contradictions . . ., or by the attending facts and circumstances, the jury [is] convinced that [the defendant] is not speaking the truth, they may reject his testimony." *Randolph v. Commonwealth*, 190 Va. 256, 263, 56 S.E.2d 226, 229 (1949). There is credible evidence to support the Commonwealth's theory that Cantrell was the only party present at the time of the murder; that he staged the event to make it look like intruders broke into his house, and held him captive, and that he in fact murdered his wife. Because we cannot say the jury's verdict was plainly wrong, we affirm their finding.

*Affirmed.*

Coleman, J., and Moon, J., concurred.