COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Willis and Annunziata
Argued at Richmond, Virginia


TROY LEE ATKINS, JR.
                                          MEMORANDUM OPINION[*] BY
v.  Record No. 2740-96-2               JUDGE JAMES W. BENTON, JR.
                                            FEBRUARY 24, 1998
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                        Robert W. Duling, Judge

            Carl C. Muzi for appellant.

            Leah A. Darron, Assistant Attorney General
            (Richard Cullen, Attorney General, on brief),
            for appellee.



     Troy Lee Atkins, Jr., was convicted of second degree murder.

On appeal, he argues that the trial judge abused his discretion

by allowing a witness to be recalled to testify at trial after

the witness violated the trial judge's order not to discuss the

case with other witnesses.  He also argues that the evidence was

insufficient to support his conviction.  We affirm the

conviction.

                                I.

     On appeal, we view the evidence in the light most favorable

to the Commonwealth, granting it all reasonable inferences fairly

deducible therefrom.  See Higginbotham v. Commonwealth, 216 Va.

349, 352, 218 S.E.2d 534, 537 (1975).  So viewed, the evidence

proved that in the early morning hours of December 27, 1995,

─────────────
     [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

Atkins drove from Emporia to Richmond with Sara Lee Odom, two of their children, and another couple.  Atkins and Odom registered at a motel and put the children to bed.

A registered nurse testified that Atkins arrived at the hospital emergency room on the afternoon of December 27.  When the nurse went outside to see Odom in Atkins' truck, Odom did not have a pulse.  Atkins told the nurse that several girls attacked Odom after Odom went to a store.  He said when Odom returned home, Odom told Atkins what happened and complained of a headache.  Atkins said when he asked Odom if she wanted to go to the hospital, Odom refused and said she would be fine after taking a shower.

Atkins also spoke with a clinical social worker in the emergency room and repeated the same events.  The social worker noted that Atkins was upset.  Atkins said that he brought Odom to the hospital after she passed out.  The social worker informed Atkins that Odom's situation was life threatening.  She also told him that if Odom was attacked, criminal assault charges would be filed against the assailants.  Atkins walked through the emergency room entrance to smoke a cigarette and never returned.

Detective Leonard testified that when he went to the hospital on December 27, Odom's body had been removed by the medical examiner.  Detective Leonard visited Emporia several times looking for Atkins and left his business cards with Atkins' friends and family.  Atkins was apprehended in North Carolina on

February 6, 1996, brought to Richmond for questioning, and gave a lengthy statement to the Richmond police explaining the events that occurred on December 27.

Testifying from Atkins' written statement, Detective Leonard stated that Atkins said he and Odom were waiting in Atkins' truck for a friend at 6:00 a.m. on December 27 when Odom decided to go to a nearby store for sodas and cigarettes. About twenty minutes later, Atkins heard loud "fussing" outside his truck. When he exited the truck, he saw Odom with a stick. Odom told Atkins that two or three women were "messing with her." After Atkins yelled at the women, they ran. He saw two or three people running off. Odom had a gash and two scratches on her face and a bleeding finger. When Atkins told Odom she should go to the hospital, she said she was fine and asked him to take her to the motel.

Atkins said that when he arrived at the motel he sent the children to get a soda for Odom. Odom then went into the room and got into the bathtub. Atkins said Odom complained because he made the water too hot and at one point said "ouch." Atkins said that he asked Odom if she had been hit with sticks and she said that she had. After the children returned, Odom sat on the bed, changed her clothes, talked and joked with the children, walked around the room, smoked cigarettes, and drank a soda. Atkins said that Odom asked him to not mention the beating to the children. At Odom's request, he took the children to a friend's

house.

Atkins' statement further recited that when he took the children to the friend's house, Odom's daughter saw blood in the truck.  She accused Atkins of fighting with her mother and asked him where the blood came from.  She said "I know you and mama . . . got mad and been fighting."  Atkins said he told her she was being "nosy."  In his statement, Atkins admitted that he and Odom had had fights before but never so severe as to require medical attention.

After leaving the children, Atkins went to a store and purchased something for Odom's pain.  When he returned to the motel, Odom was dressed.  Odom said she did not have a headache and was not sore.  Although he rubbed the ointment on her, Odom did not take the medicine he purchased for her pain.

Atkins said that later in the afternoon he and Odom went to Atkins' uncle's house and remained inside for twenty minutes. Odom said she couldn't breath, and she fainted.  With the assistance of another woman, Atkins gave Odom mouth-to-mouth resuscitation.  Atkins then took Odom to the hospital.  Atkins said that he did not contact the police after leaving the hospital because he did not have their phone number and because he was afraid a warrant would be issued for his arrest.

Later in his statement, Atkins gave another version of the events.  Atkins said that when he was sitting in the truck and heard the voices, he jumped out of the truck and saw Odom coming

- 4 -

toward him. Odom had a gash on her face. Later, when Odom was taking her bath and Atkins saw her injuries, he told her it looked as if she had been hit with sticks. She told him she had been beaten with sticks.

Odom's fourteen-year-old daughter testified that at 8:00 a.m. on December 27, her mother was seated motionless in Atkins' truck in front of the motel room. Atkins got a coat from the motel room. Odom's daughter next saw the coat over her mother's shoulders. Atkins sent the two children to get sodas, and he told them he and Odom were going to visit another couple in the motel. When the children returned with the sodas, Atkins and Odom were in the bathroom of the motel room. Odom's daughter passed a soda through the slightly opened door and heard her mother say "ouch." Later, Odom's daughter saw her mother lying in bed with the sheets pulled up to her shoulders. Odom's daughter said her mother never spoke to her or the other child. She never saw Odom walking around, smoking, talking, or drinking her soda.

Later, when the children awoke, Atkins left Odom at the motel and took the two children to a friend's house. The daughter saw blood in Atkins' truck on the rear passenger window and headrest. When she asked Atkins if he had been fighting with her mother, he just smiled. He asked her why she asked, and she replied "[b]ecause I see blood." She testified that Atkins made no further comment.

Dr. Jack Daniel, the assistant medical examiner, opined that Odom died of acute head trauma. He testified that "her entire back, her buttocks, . . . the entire extent of her left arm, [and] much of her right arm were covered with prominent bruises. Associated with those bruises were a large number of small angular . . . lacerations." Four lacerations on Odom's head caused "a great deal of bleeding into her scalp" and bleeding on the top of her brain. Odom had bruising and abrasions on the front of both of her lower legs and her right knee, and she had extensive bruising and swelling on both hands. Her right ring finger was broken. Dr. Daniel testified that Odom also had abrasions on the tip and sides of her nose and around her mouth. The most severe injury on her face was a deep laceration about a quarter of an inch long on the right side of her face near her nose. Dr. Daniel further testified that if a stick had been used in the beating, he would have expected a broken nose rather than this type of injury.

Dr. Daniel opined that the "very, very severe bruising," the extensive tissue damage, and the absence of major bone fractures indicated that a flexible instrument was used to inflict Odom's injuries. He testified that all of the marks, including the angular irregular marks, were "entirely consistent" with having been inflicted with a belt buckle. He also opined that the configuration of a belt and its buckle recovered by the police from Atkins' truck was "entirely consistent" with Odom's

injuries.  He testified, however, that any other belt could have been used and that he could not rule out the possibility that a tree branch was used to inflict these injuries.  Dr. Daniel further testified that Odom's injuries were inflicted by a dozen or more blows and that the severity of Odom's injuries would have been immediately apparent to anyone who saw her.

Dr. Daniel was recalled to testify after several witnesses had testified.  When Atkins' counsel objected to his further testimony, Dr. Daniel was questioned to determine whether he had violated the judge's admonition not to discuss the case with others.  During the course of this <u>voir</u> <u>dire</u>, Dr. Daniel testified that a North Carolina detective, who had testified earlier in the trial and had sat through Dr. Daniel's testimony, talked with him during lunch.  After further <u>voir</u> <u>dire</u>, the trial judge overruled the objection.

Dr. Daniel testified again and opined that while Odom might have been conscious for several hours after the injuries were inflicted, he could not say "with any confidence" that she would have been coherent.  He stated that Odom would have become "progressively less coherent, less responsive over a period of hours if in fact she did not lose consciousness immediately."

At the conclusion of the evidence, the trial judge convicted Atkins of second degree murder.

## II.

Atkins first contends that the trial judge erred in not

barring Dr. Daniel's second testimony. Atkins argues that Dr. Daniel violated the judge's order not to discuss the case with others and that the doctor had been prepared by other Commonwealth's witnesses to answer certain questions prior to being recalled to testify. Atkins asserts that he was prejudiced by the testimony because without it, the Commonwealth would not have established when Odom was beaten.

On voir dire, before his second testimony, Dr. Daniel testified that when he spoke to the North Carolina detective at lunch, "there was some question as to whether or not . . . certain questions that might have been asked . . . about the length of survival" and "what [the victim] might have been capable of doing." Dr. Daniel stated that his opinions were not changed as a result of his conversation with the detective. When questioned by the trial judge, Dr. Daniel testified that although he was aware of the nature of the questions he was about to be asked by the Commonwealth's attorney, any response he would give was unrelated to his conversation with the detectives.

The North Carolina detective testified that during their walk to lunch he said to Dr. Daniel, "in North Carolina one of the questions . . . would have asked the time. How long she would have lived." He said that Dr. Daniel's response was "that would have been a responsible or respectable question."

Detective Leonard, who testified after the lunch recess, overheard the conversation. He testified that the North Carolina

"detective . . . asked him -- he didn't understand why . . . the Commonwealth attorney didn't ask Dr. Daniel . . . what the girl could do after the beating.  What she would be able to do." Detective Leonard could not recall Dr. Daniel's response and stated that he did not remember contributing to the conversation.

The Commonwealth's attorney stated that after lunch he realized that he had forgotten to ask Dr. Daniel several important questions.  The Commonwealth's attorney stated that he did not discuss these questions with Detective Leonard or the North Carolina detective and that the questions were in his notes but that he simply forgot to ask them.

Defense counsel asked the trial judge to prohibit Dr. Daniel from testifying or to declare a mistrial.  The judge denied the motion and ruled as follows:

> The paramount question in the Court's mind is whether the conversations that took place outside of this courtroom that should not have taken place is likely to change the testimony to be offered at this time by Dr. Daniel.  The Court has concluded that those conversations and the manner in which this situation arose will not affect the testimony by Dr. Daniel as to whatever questions he may be asked at this point during the remainder of his time on the stand as a witness and for that reason the Court sees no useful purpose would be served by declaring a mistrial and I shall not do that.

"The purpose of excluding witnesses from the courtroom is, of course, to deprive a later witness of the opportunity of shaping his testimony to correspond to that of an earlier one." Huddleston v. Commonwealth, 191 Va. 400, 405, 61 S.E.2d 276, 279

(1950).  "A judge's admonition to witnesses not to discuss
[their] testimony with third parties until the trial is completed
. . . [is intended to] lessen the danger that [a witness']
testimony will be influenced by hearing what other witnesses have
to say, and to increase the likelihood that [witnesses] will
confine themselves to truthful statements based on their own
recollections."  Perry v. Leeke, 488 U.S. 272, 281 (1989).

"A trial [judge] has discretion to decide whether a witness
who violates an exclusion order should be prevented from
testifying."  Bennett v. Commonwealth, 236 Va. 448, 465, 374
S.E.2d 303, 314 (1988).  On review, we must consider "whether
there was prejudice to the defendant . . . [,] whether there was
intentional impropriety attributable to the prosecution . . . [,]
whether the out-of-court comments concerned any substantive
aspect of the case[,] and whether [the comments] had any effect
on the witness' testimony."  Id.  Thus, "we cannot reverse the
trial court's action in permitting [Dr. Daniel] to testify unless
it appears that [Atkins] was prejudiced by such action."  Satcher
v. Commonwealth, 244 Va. 220, 244, 421 S.E.2d 821, 836 (1992).

Although Dr. Daniel's testimony regarding the length of time
Odom would be conscious after the beating and Odom's degree of
coherence was damaging to Atkins, that is not the test of
prejudice.  Rather, prejudice occurs where the violation of the
exclusion order somehow influences the testimony of the witness
on the stand.  See Bennett, 236 Va. at 464-65, 374 S.E.2d at

314-15 (no abuse of discretion where witness did not change testimony as result of information obtained from Commonwealth in violation of exclusion order); Jury v. Commonwealth, 10 Va. App. 718, 721, 395 S.E.2d 213, 215-16 (1990) (abuse of discretion to refuse to allow witness who unintentionally remained in courtroom in violation of exclusion order to testify because there was no showing that witness' presence in courtroom influenced his testimony). No evidence proved that Dr. Daniel's testimony was influenced by his conversation with the North Carolina detective.

Although the conversation between Dr. Daniel and the North Carolina detective violated the nondiscussion order, it did not constitute a "coaching session" as Atkins suggests. The North Carolina detective merely commented that the Commonwealth's attorney forgot to ask a pivotal question, and Dr. Daniel agreed. The detective did not prepare Dr. Daniel to answer certain questions; indeed, he and Dr. Daniel did not discuss Dr. Daniel's responses to any questions. Furthermore, Dr. Daniel testified that although he knew what he would be testifying about, his answer to the question was based on his autopsy and examination of the victim, not on his lunch time conversation.

Having examined the record, we hold that the trial judge did not abuse his discretion in permitting the witness to testify.

### III.

We also hold that the evidence was sufficient to support Atkins' conviction for second degree murder. Although the

- 11 -

evidence in this case is entirely circumstantial, the principle is well established that circumstantial evidence alone may be sufficient to support a conviction.  See Johnson v. Commonwealth, 2 Va. App. 598, 604-05, 347 S.E.2d 163, 167 (1986).  When a case is based on circumstantial evidence, the circumstances proved must be consistent with guilt and exclude every reasonable hypothesis of innocence.  See Garland v. Commonwealth, 225 Va. 182, 184, 300 S.E.2d 783, 784 (1983).  The Commonwealth "'is not required to disprove every remote possibility of innocence, but is, instead, required only to establish guilt of the accused to the exclusion of a reasonable doubt.'"  Cantrell v. Commonwealth, 7 Va. App. 269, 289, 373 S.E.2d 328, 338 (1988) (citation omitted).

Atkins argues that his mere presence with Odom was insufficient to support his conviction and that the evidence does not exclude the hypothesis suggested by his statements to police that Odom was injured when she was attacked on the street by a group of people.  The principle is firmly established that "[o]pportunity is always a relevant circumstance . . . and, when reinforced by other incriminating circumstances, may be sufficient to establish criminal agency beyond a reasonable doubt."  Christian v. Commonwealth, 221 Va. 1078, 1082, 277 S.E.2d 205, 208 (1981).  Here, there is substantial other circumstantial evidence that supports the trial judge's finding.

Atkins' statement that Odom was functioning normally several

hours after receiving her injuries was contradicted by the medical evidence presented by Dr. Daniel and the testimony of Odom's daughter. Dr. Daniel testified that by the nature and severity of Odom's injuries, she could not have functioned as Atkins suggests. If Odom had not been rendered unconscious by the beating, Odom would have become progressively less coherent and responsive. Odom's daughter's testimony further contradicts Atkins' statements about Odom's behavior after the beating. She did not see Odom smoke, drink, walk around, or even talk after Odom and Atkins arrived at the motel.

The trial judge was not required to accept Atkins' version of events. See Rollston v. Commonwealth, 11 Va. App. 535, 547, 399 S.E.2d 823, 830 (1991). The trial judge could disregard Atkins' versions of events and chose to believe the testimony of Dr. Daniel and Odom's daughter. "[D]eterminations of credibility lie within the purview of the fact finder, who may reject a witness' testimony and base a finding of guilt upon contradictory statements. The fact finder may conclude that the defendant lied to conceal his guilt." Moore v. Commonwealth, 25 Va. App. 277, 289, 487 S.E.2d 864, 870 (1997). See Sheppard v. Commonwealth, 250 Va. 379, 389, 464 S.E.2d 131, 137 (1995). Indeed, Atkins' contradictory statements to police and witnesses about the events leading up to Odom's death render doubtful the hypothesis suggested by Atkins that Odom's injuries were caused by others. The trial judge could reasonably infer that Odom could not have

- 13 -

functioned normally as Atkins suggests but that she would be increasingly approaching a state of unconsciousness.

In summary, Atkins was present when Odom was injured and bleeding; he gave several contradictory statements about the events in question; and Atkins' version of Odom's functioning ability after the beating was contradicted by the medical evidence.  In addition, the belt found in Atkins' truck was consistent with the marks on Odom's body.  Atkins fled the hospital, left the jurisdiction, and intentionally evaded the police for one and a half months after the incident.  See Langhorne v. Commonwealth, 13 Va. App. 97, 102, 409 S.E.2d 476, 480 (1991) (an inference of guilty conduct arises from evidence and avoidance of the police).  Viewed in the light most favorable to the Commonwealth, the evidence was sufficient to prove beyond a reasonable doubt Atkins' guilt of the offense of second degree murder.

For the foregoing reasons, we affirm the conviction.

Affirmed.