**Norfolk**

ROBERT CHARLES WITT

v.

COMMONWEALTH OF VIRGINIA

No. 0194-90-1

Decided September 29, 1992

COUNSEL

James O. Broccoletti (Zoby & Broccoletti, P.C., on brief), for appellant.

Kathleen B. Martin, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**BAKER, J.**—Robert Charles Witt (appellant) appeals from his jury trial conviction by the Circuit Court of the City of Portsmouth (trial court) for burglary and grand larceny. Appellant alleges the trial court erred (1) in failing to exclude certain portions of an audiotape as being evidence of other crimes, (2) by admitting into evidence the audiotapes when a proper foundation had not been laid, (3) by failing to grant a mistrial when the Commonwealth failed to link up portions of the "other crimes" evidence with the evidence presented at trial, and (4) by not granting a mistrial after a witness who was testifying claimed to be threatened by someone in the courtroom. For the reasons that follow, we reverse.

On appeal, we view the evidence in the light most favorable to the Commonwealth, granting to it all inferences fairly deducible therefrom. *Wright v. Commonwealth*, 224 Va. 502, 505, 297 S.E.2d 711, 713 (1982). Viewed accordingly, the record discloses that on February 6, 1986, at approximately 10:00 p.m., appellant and Eli Campbell broke into the Navy Yard Credit Union building (credit union) in Portsmouth and stole $194,103 from the credit union safe. Prior to entry, appellant ascended a nearby telephone pole and cut the power supply line to the building and dismantled the alarm on the roof of the credit union. Believing that he heard the alarm sound, appellant, by

means of a "walkie-talkie," notified Robert Kidd, his lookout,[1] that he was temporarily ceasing the mission. Appellant left the scene for approximately one-half hour and then returned to complete the theft.

Kidd testified on behalf of the Commonwealth and admitted his part as the "hawk" (lookout) in the crimes. He stated that appellant was an electrician and planned the burglary.[2] He and appellant had "checked out" the credit union building and had located the burglar alarm and the telephone line that would have to be cut. Kidd and appellant decided that Kidd's look-out position would be across the street in a second-floor room of a motel. From this position, Kidd communicated with appellant by walkie-talkie, as appellant made entry into the credit union.

Kidd kept with him in the motel room a special saw purchased for the purpose of opening the credit union safe. Appellant radioed a request to Kidd to bring the saw to appellant at a side door of the building. Kidd complied. Appellant and Campbell worked at opening the safe for approximately two hours, announced by walkie-talkie that they had succeeded and called for Kidd to pick them up. Again, Kidd complied. He was given a bag of money and told to meet them at appellant's electric shop. They departed, appellant and Campbell in one car and Kidd driving a separate car.

After meeting at the shop, Kidd threw the burglar tools in a canal. They then went to a motel, where they divided the money. Kidd received $62,000. The tools were later found, identified by Kidd and introduced into evidence.

Subsequently, Kidd was arrested and jailed in Virginia Beach for breaking and entering. When arrested, he had a gun in his possession. He previously had been convicted of approximately ten felonies. His interviews by Federal Bureau of Investigation agents and Virginia Beach police resulted in Kidd's agreement to reveal his part in the credit union theft and his cooperation in attempts to make recordings by body wire and telephone recordings of conversations with appellant. Kidd's objective was to procure and record statements that would incriminate appellant. Several recordings were made and introduced over objection at appellant's trial.

---

[1] Kidd also had a police scanner with him.

[2] Appellant told Kidd that he had wired the credit union building.

At trial, as the examination of Kidd was about to conclude, Kidd suddenly stated, "I'm being distracted." The Commonwealth's attorney asked to approach the witness and the trial court agreed. Both attorneys then approached the bench and the Commonwealth's attorney explained that an associate of appellant's was in the courtroom and was making threatening gestures toward Kidd. The trial court excused the jury and had the spectator removed from the courtroom. This spectator had been accompanying appellant's wife to the trial. Thereafter, the trial judge stated the following:

> Now, before the jury comes back, I want to say that we had a gentleman escorted from the courtroom because there was a complaint that he was making gestures toward the witness. I did not see those gestures. I was watching the witness, so the Court did not see that. I have been advised by the bailiffs in this court, however, that that did as a matter of fact take place.

Appellant moved for a mistrial on the ground that Kidd's statement was audible to the jury; that the statement concerned a threat; and that the statement was prejudicial to appellant. Appellant's attorney also moved to proffer to the trial court evidence that certain spectators approached him during the recess to volunteer information they had about the incident. This motion was denied.

At the conclusion of the Commonwealth's evidence, appellant made a motion to strike. The trial court allowed appellant's attorney to proffer that Michael Pitt, an officer of the court, as well as other spectators in the courtroom heard Kidd tell the Commonwealth's attorney that the person who was removed from the courtroom had mouthed, "I'm going to get you." Appellant argued that it was impossible for the jury not to have heard Kidd's statement to the Commonwealth's attorney and, thus, appellant was prejudiced by the statement. The trial court overruled the motion to strike.

Appellant also moved the trial court to poll individually the jurors as to whether or not they heard anything Kidd said during his sidebar conference with the Commonwealth's attorney. This motion was overruled.

## I. EXCLUSION OF THE AUDIO TAPES

Appellant first asserts that the trial court erred in failing to exclude certain portions of the audiotapes as being evidence of other crimes. At the hearing on appellant's motion *in limine*, the trial court deleted

many parts of the audiotapes as being prejudicial to appellant. The parts that were not deleted contained appellant's references to police surveillance of his place of business, procedures or methods for dismantling alarms and gaining entry into credit unions in general, and references to the Navy Yard Credit Union.

■ Although the general rule in a criminal prosecution is to exclude evidence of other crimes for the purpose of proving the commission of the present crime, there are many exceptions to this rule. *See Kirkpatrick v. Commonwealth*, 211 Va. 269, 176 S.E.2d 802 (1970).

> Evidence of other offenses is admitted . . . if it tends to prove any relevant element of the offense charged. Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved or where the evidence is connected with or leads up to the offense for which the accused is on trial. Also, testimony of other crimes is admissible where the other crimes constitute a part of the general scheme of which the crime charged is a part.

*Id.* at 272, 176 S.E.2d at 805. *See also Spencer v. Commonwealth*, 240 Va. 78, 89, 393 S.E.2d 609, 616, *cert. denied*, 498 U.S. 908 (1990); *Cheng v. Commonwealth*, 240 Va. 26, 34, 393 S.E.2d 599, 603 (1990).

We find that the trial court did not err in ruling that portions of the audiotapes were admissible. These portions of the tapes were probative of appellant's knowledge of dismantling alarm systems and of credit unions in general. The audiotapes fit into several exceptions to the general rule as listed in *Kirkpatrick* and affirmed in *Cheng* and *Spencer*.[3]

The evidence of dismantling an alarm system as presented in the tapes shows remarkable similarity to Kidd's testimony of dismantling an alarm system. In one portion of the tapes, appellant discusses with Kidd the procedure to dismantle the alarm system at a specific credit union in Virginia Beach:

> [T]he first thing you gotta do is cut the phone line and you have a back up . . . . Wait for at least 20 minutes or half hour because all of these credit unions now, I know this for a fact, they

---

[3] For example, intent to commit a felony is an element of the crime of burglary. This intent may be inferred from the defendant's unauthorized presence in a building at night. *See Ridley v. Commonwealth*, 219 Va. 834, 252 S.E.2d 313 (1979).

wired um [sic] so when you cut the phone wires it sets the alarm off . . . . Well anyway, if you do that, you're home free. It's one of the easiest other than the alarms, it's one of the easiest ones I've ever seen.

At trial, Kidd testified that by cutting the telephone line, "it shuts down the silent alarm system, and then you have to dismantle the bell box, burglar alarm." The trial court did not err in admitting the tapes.

## II. AUDIOTAPES—PROPER FOUNDATION

A proper foundation must be laid for the introduction of all evidence. The burden is upon the party offering real evidence to show with reasonable certainty that there has been no alteration or substitution of it. But, the burden is not so absolute that one must eliminate all possibility of tampering.

*Horsley v. Commonwealth*, 2 Va. App. 335, 338, 343 S.E.2d 389, 390 (1986).

In the present case, Special Agent Cross of the Federal Bureau of Investigation testified that he made duplicates of the original body recordings between Kidd and appellant. Cross explained that the body recordings were made on reel-to-reel tapes and there are no counters on reel-to-reel recorder machines. In order to facilitate the playing and stopping of the tapes so that certain portions of the tape would not be played to the jury, a cassette tape recorder which has a counter on it would be easier to operate. Therefore, the duplicates of the body recordings were played to the jury. The telephone conversations that took place were recorded on cassette tapes; thus, the originals of those taped conversations were played to the jury.

Cross further testified that he gave the tapes to a typist to transcribe the tapes verbatim and that he reviewed her work by listening to the tapes himself and making corrections on the transcript.

We find that the Commonwealth sufficiently showed through Cross' testimony that the duplicate tapes had not been altered or substituted. Furthermore, Kidd, who was a participant in the conversations, testified that the taped conversations were accurate. Therefore, we find that a proper foundation was laid for admitting the duplicate tapes into evidence.

## III. CONNECTION OF THE "OTHER CRIMES" EVIDENCE TO EVIDENCE PRESENTED AT TRIAL

At the conclusion of the trial, appellant again moved for a mistrial. Appellant argued that no evidence was presented to show that what was described in the audiotapes was the same method of operation appellant used to burglarize the credit union. We disagree.

On the audiotapes appellant discussed cutting wires, cutting phone lines, waiting "for a least 20 minutes or half hour," dismantling the alarm, going on the roof, having radios and having a "hawk" (a lookout).

At trial, Kidd testified that he was the "hawk" and that he communicated with appellant via walkie-talkie radios. He described how appellant cut the telephone wire, how appellant went on the roof, how appellant dismantled the alarm and how appellant came back to the motel room for approximately thirty minutes before going back to the credit union.

■ As stated in *Spencer*:

> We adopt the standard articulated by the Seventh Circuit in *United States v. Hudson*, 884 F.2d 1016 (7th Cir. 1989): evidence of other crimes, to qualify for admission as proof of *modus operandi*, need not bear such an exact resemblance to the crime on trial as to constitute a "signature." Rather, it is sufficient if the other crimes bear "a singular strong resemblance to the pattern of the offense charged."

240 Va. at 90, 393 S.E.2d at 616 (citations omitted).

We find that the Commonwealth linked up the evidence of the other crimes as described in the audiotapes to show appellant's *modus operandi* in burglarizing the credit union. Moreover, any prejudice to appellant is far outweighed by the legitimate probative value of the evidence. *See id.*

## IV. THREATENED WITNESS

Near the conclusion of his testimony, Kidd, in the presence of the jury, voluntarily exclaimed, "I'm being distracted." With the jury still in the box, the prosecutor was permitted to approach the witness and engage in a conversation with him, presumably concerning his exclamation. We do not know what, if any, part of that conversation was

heard by the jury. The prosecutor then asked for a bench conference while the jury remained in the courtroom. The trial court was advised that an associate of appellant was in the courtroom audience "shaking his head as though in a threatening way with Mr. Kidd," and the court was requested to "take a break and iron it out so we don't have to involve the jury too much." The jury was retired from the courtroom. A bench conference was held between the prosecutor, defense counsel and the trial court. This conference was not recorded; however, at its conclusion, a member of the audience identified as "Mr. Scellotto" was removed from the courtroom. At that point, appellant moved for a mistrial and in support thereof said:

MR. ZOBY: First of all, Your Honor, the statement of the witness was certainly audible to virtually everyone in the courtroom I believe, certainly audible to the jurors, and the implication was from that statement that he was being threatened by someone. Now, that, the nature of that threat would only inure to the detriment and prejudice of the defendant, Robert Witt. That is the first grounds.

There were a number of people moving about in the courtroom and a number that weren't moving about and I have had people come up to me during the recess who have no interest in this case and volunteer information about movement and nonmovement.

If in fact there was a threat, this courtroom is teeming with deputies, with police officers and FBI agents. It would appear to me that the statement of Mr. Kidd was not only unnecessary but aimed to be prejudicial against the defendant, Your Honor.

That is our first point, and I think that in pursuing that it would be worthwhile to have some evidence put on by the people in the courtroom that saw the incident occur or didn't see it occur as the case may be because, again, as I've said, there have been quite a few comments in the courtroom by people—

The trial court overruled the motion, saying, "We're not going to have a trial within a trial." The trial court then stated that it had been advised by the bailiffs that "gestures" had been made by Scellotto who had accompanied appellant's wife to court on the day before as well as that day.

Counsel for appellant added a second reason for his motion for mistrial:

MR. ZOBY:      Your Honor, if I may, I'd like to put on the second grounds for mistrial.

His Honor has directed both counsel for the Commonwealth and counsel for the defense to have no more sidebar conferences, that such would be taken up in private and out of the hearing of the jury. In spite of that the Commonwealth's Attorney walked up to the witness, walked directly to the witness stand in violation of what His Honor had previously ruled, and His Honor said, "Go ahead," at which time the witness blurted out extremely prejudicial remarks.

Since we've both been ordered not to have sidebar conferences and this particular one the defense contends has completely ruined this man's right to a fair trial, we'd ask His Honor to declare a mistrial on the grounds she violated your order against sidebar conferences.

The trial court again denied the motion.

The trial court, after refusing to hear evidence relative to the threatening motions, agreed that at the conclusion of the Commonwealth's evidence, appellant would be permitted to proffer for the record testimony in support of his request to present evidence which would show prejudice to appellant resulting from Kidd's exclamation that he was being "distracted."

MR. ZOBY:      I believe that Mr. Kidd's original remark was, "There's someone distracting me," and, "Will you come up here," at which time Miss Boyle started approaching the witness and Mr. Broccoletti objected; His Honor said, "Let her go."

As she got in front of Mr. Kidd, I believe Mr. Kidd's first remark was that, "There's someone out there nodding their head at me, there's someone out there threatening," or —I don't remember his exact words—"threatening me, saying he's, mouthing he's going to get me," or something to that effect. That was the first incident.

Now, there were—The reason my recollection is not that clear as to what I heard and what I told you then is that

I spoke to others who had distinct recollections that were identical that were actually worse than what I've just said. So—

In addition, appellant requested the trial court to hear testimony from Michael Pitt, an attorney who represented the co-defendant and who was a spectator in the courtroom. The trial court refused to permit Pitt to testify. Counsel for appellant then further proffered:

MR. ZOBY: All right. Your Honor, my last point is that what others heard was more inflammatory than what I heard and that Mr. Pitt would testify if allowed that seated past the jury box, past the jurors, he heard Mr. Kidd say that the person in the courtroom was mouthing, ''I'm going to get you.'' And there were other witnesses, a number of them all the way towards the back of the courtroom, that heard such remarks as that, and certainly I don't see how the jury could possibly have missed that when virtually everyone in the courtroom yesterday—There were people coming up to me that had no interest in this case that stated to me that they'd heard that and they were three-fourths of the way to the back of the courtroom. That's why my recollection is probably not as accurate as what they would say because I had to listen to what other people were saying about it. But I would submit to His Honor there's no way the jury didn't hear that and I think that Mr. Kidd said it in that tone of voice for the purpose of the jury hearing it.

\* \* \*

MR. ZOBY: Your Honor, the last point to make is that based on what has been stated, even stated by the Commonwealth, there's no indication that it was not Witt who had made these gesticulations, if any, and the jury may well think it was Witt who made these gesticulations and mouthings and this sort of thing, and that's why I think his chance of a fair trial is severely impaired.

■ Finally, appellant requested the trial court to poll the jury individually to determine whether any of them had heard the threatening remarks that followed Kidd's exclamation. The trial court refused to permit the poll.

''The test in a criminal case is not whether the jurors were actually prejudiced by the extraneous matter but whether they might have been so prejudiced. If they might have been prejudiced, then

the purity of the verdict is open to serious doubt and the verdict should be set aside and a new trial awarded."

*Evans-Smith v. Commonwealth*, 5 Va. App. 188, 207-08, 361 S.E.2d 436, 447 (1987) (quoting *Thompson v. Commonwealth*, 193 Va. 704, 715, 70 S.E.2d 284, 290 (1952)). To assure fairness of trial, the motion to poll the jury should have been granted. It was error for the trial court to refuse that motion. Whether the trial court, counsel, the bailiffs or other court officials heard the proffered evidence is not controlling. It is the jury's decision that determines the fate of the accused and that decision must be free of doubt. Here, that could only have been assured by a poll.

For the reasons stated, the judgments of the trial court are reversed and this case remanded to the trial court for such further action as the Commonwealth may be advised.

*Reversed and remanded.*

Benton, J., and Willis, J., concurred.