### Salem

JOHN DAVID LAFON

V.

COMMONWEALTH OF VIRGINIA

No. 2244-91-3

Decided November 30, 1993

COUNSEL

Douglas E. Brinkman (Raphael B. Hartley, III; Frank & Hartley, on brief), for appellant.

Richard B. Smith, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

OPINION

**KOONTZ, J.**—John David Lafon (Lafon) was convicted by jury on counts of first-degree murder, illegal use of a firearm during the commission of a murder and simple abduction in connection with the death of Meredith Anne Mergler (Mergler). On appeal, Lafon contends (1) the trial court erred in admitting testimony regarding Lafon's prior bad acts; (2) the trial court erred in admitting testimony from two lay witnesses that expressed an opinion as to the ultimate fact of Lafon's guilt; (3) the trial court erred in not suppressing uncounseled statements made by Lafon to a police informant; and (4) the Commonwealth failed to present evidence sufficient to sustain Lafon's

conviction for simple abduction. For the reasons that follow, we affirm Lafon's convictions.

Meredith Anne Mergler, a student at Virginia Polytechnic Institute & State University, disappeared sometime during the early morning hours of Sunday, August 30, 1987 after leaving a restaurant in Blacksburg. She had planned to return to her home in Northern Virginia that morning with Ann Ryan, a fellow student. Ryan informed Mergler's family that Mergler failed to meet Ryan that morning and that mutual friends Ryan had contacted could not locate Mergler.

Efforts by Blacksburg Police and a private investigator hired by Mergler's family failed to elicit any information concerning Mergler's disappearance. During the early days of the investigation, Lafon made inquiries to the Giles County Sheriff's office concerning the investigation. Lt. Bill Stables, who knew Lafon as an occasional informant, told Lafon that Blacksburg police had not indicated any connection between the investigation and Giles County.

On October 17, 1988, David Kanode, his father, and Roger Whittaker, a family friend, visited property the Kanode family owned in Giles County. The family had not used the property in several years, but a woman named Lucy Seymour occasionally checked on the property for the Kanodes. She had visited the property last in early August 1987. At that time, only loose boards covered the well on the property. Unknown to either the Kanodes or Seymour, Lafon and William Link had cultivated the property in 1987 and had used the well for irrigation.

While clearing brush from the land, Kanode asked Whittaker to examine the well. Whittaker discovered a concrete slab covering the boards; nonetheless, he could see into the shaft and saw a body floating at the bottom of the well. The three men immediately left the property and contacted the Giles County Sheriff's office.

Deputies recovered from the well a body later identified as Mergler's. An autopsy showed that Mergler's body had been exposed to a high concentrate of lime and water; death had resulted from two shotgun wounds, either of which would have been fatal. Deputies also recovered a number of Mergler's personal effects from the well along with three shotgun shell casings and three shell wads.

Forensic tests identified the shell casings as Remington .12 gauge loads. The same weapon fired two and possibly all three of the shells. Lafon owned and hunted with a .12 gauge shotgun at the time of Mergler's disappearance.

When Lafon learned of the discovery of the body, he told William Link and others that he knew "where we all were that night [be]cause I figured the law would be hounding me about this." Lafon insisted that he and his friends could alibi one another because they had all attended a party and had not left until 2:00 a.m. the morning of Mergler's disappearance. Link reminded Lafon that in fact they (Link and Lafon) had left the party at 11:30 p.m. Link recalled that Lafon had specifically requested that Link note the time, 12:10 a.m., that Lafon had dropped Link at the latter's home.

Lt. Stables testified that he conducted the investigation following the discovery of Mergler's body. He interviewed Lafon as a potential informant, but did not consider Lafon a suspect. In March 1990, Stables interviewed Melinda Link on an unrelated matter and, in accord with his practice at the time, concluded by inquiring about the Mergler homicide. Melinda Link stated that Lafon had killed Mergler and directed Stables to interview Doug Jones, a friend of Lafon's.

Jones at first refused to discuss the matter with Stables, but after a friend assured Jones that he could trust Stables, Jones obtained a tape recorder and met with Lafon, recording their conversation. Jones gave a letter to Stables detailing Lafon's statements along with the tape of their conversation. Jones then agreed to tape future conversations he had with Lafon. Jones thereafter taped several conversations with Lafon and one conversation Jones had with Lafon's counsel in which they discussed the murder and the well on the Kanode property. The trial judge overruled Lafon's motion in limine to exclude the tapes and other evidence derived from these conversations. The tapes of Jones's conversations with Lafon were played during the trial.

At trial, Jerry Martin, over Lafon's objection that the evidence lacked relevance and unfairly prejudiced his character, recalled an incident in which he, Lafon, Doug Jones and William Link drove to Blacksburg in June 1986 after Lafon said he knew where they could find a woman in Blacksburg. Arriving in Blacksburg, the group drove to a residential area of apartments where many Virginia Tech co-eds lived. Lafon asked Jones and one of the other men if they would "grab the girl," but they refused to do so. Lafon then said that he would "get

her," and directed one of the other men to cruise the area. Lafon spotted a young woman and engaged her in a brief conversation, but made no attempt to accost her. After he and the other men drove away, Lafon commented that they would have to kill any woman they picked up.

Doug Jones testified that sometime during the spring of 1988, prior to Jones's first contact with Stables, Lafon visited Jones at the store where Jones worked. Asking to speak to him privately, Lafon told Jones, "I did it, Douglas, I did it . . . I've put something in a well I can't let anybody find." Jones asked Lafon what he meant, and Lafon said, "What we had always talked about before, going to Blacksburg to pick up a girl and take her to the mountains, rape her and bury her there." Lafon then asked Jones to describe how to construct a concrete form to cover the top of the well. Jones described the method for making a concrete form and then asked Lafon what he would do if someone discovered the body. Lafon replied, "[T]hey couldn't find out because he (Lafon) had put lime down in the well to dissolve the body and keep the smell down." In 1987, Lafon worked for the Virginia Lime Company and had access to the quick lime which the company produced.

Upon learning of the discovery of Mergler's body, Jones confided in Sherry Roberts, a co-worker, that he believed Lafon had committed the murder. Jones stated several times during his testimony, without objection from Lafon, that he believed Lafon had committed the murder. Only during redirect examination, when Jones recounted a statement made to police regarding Lafon's capability to commit such crimes, did Lafon object to Jones's stating an opinion as to Lafon's guilt.

During cross-examination, Lafon attempted to show that Jones had only recently fabricated the story of Lafon's admissions. Over Lafon's objection, the trial judge permitted Roberts to testify concerning her conversation with Jones as prior consistent statements.

Lafon did not testify but presented witnesses to impeach the credibility of the Commonwealth's witnesses. Lafon's wife presented alibi testimony, stating that Lafon had returned home intoxicated at 12:15 a.m. on the morning of Mergler's disappearance.

## I. THE PRIOR BAD ACTS ISSUE

■ Lafon argues that the testimony of Jerry Martin and certain statements made by Lafon during taped conversations with Doug Jones contained improper statements of prior bad acts committed by Lafon. As a general rule, evidence that shows or tends to show crimes or other bad acts committed by the accused is incompetent and inadmissible for the purpose of proving that the accused committed or likely committed the particular crime charged. *Kirkpatrick v. Commonwealth,* 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970). Evidence of other specific, similar bad acts does not logically support the inference that an accused has a propensity to commit bad acts of this nature and, therefore, the accused probably committed the bad act with which he or she stands charged. *Spence v. Commonwealth,* 12 Va. App. 1040, 1045, 407 S.E.2d 916, 918 (1991); *Sutphin v. Commonwealth,* 1 Va. App. 241, 245, 337 S.E.2d 897, 899 (1985).

■ Well established exceptions to the general rule of exclusion of other bad acts evidence apply where the evidence is relevant to show some element of the crime charged. To be admissible as an exception, evidence of other bad acts must be relevant to an issue or element in the present case. *Sutphin,* 1 Va. App. at 245, 337 S.E.2d at 899. In *Sutphin,* we enumerated the most common issues and elements for which evidence of prior crimes and bad acts are potentially relevant:

> (1) to prove motive to commit the crime charged; (2) to establish guilty knowledge or to negate good faith; (3) to negate the possibility of mistake or accident; (4) to show the conduct and feeling of the accused toward his victim, or to establish their prior relations; (5) to prove opportunity; (6) to prove identity of the accused as the one who committed the crime where the prior criminal acts are so distinctive as to indicate a *modus operandi;* or (7) to demonstrate a common scheme or plan where the other crime or crimes constitute a part of a general scheme of which the crime charged is a part.

*Id.* at 245-46, 337 S.E.2d at 899. This list is neither exhaustive nor definitive; intent, general (as opposed to guilty) knowledge, agency, premeditation and other elements of criminal acts are all subsumed within the exceptions to the general rule and may be shown by prior bad acts evidence when relevant to prove a material element or issue of the crime charged. *See Freeman v. Commonwealth,* 223 Va. 301, 313-14, 288 S.E.2d 461, 467-68 (1982); *Evans v. Commonwealth,* 222 Va.

766, 773-74, 284 S.E.2d 816, 820 (1981), *cert. denied,* 455 U.S. 1038 (1982); *Barber v. Commonwealth,* 182 Va. 858, 867, 30 S.E.2d 565, 569 (1944); *Callahan v. Commonwealth;* 8 Va. App. 135, 140, 379 S.E.2d 476, 479-80 (1989).

■ In order for evidence that the accused has committed other crimes or bad acts to be admissible under an exception, its relevance to prove a material fact or issue must outweigh the prejudice inherent in proving that the accused has committed other bad acts. *Spencer v. Commonwealth,* 240 Va. 78, 90, 393 S.E.2d 609, 617, *cert. denied,* 498 U.S. 908 (1990). The decision to admit such evidence involves a balancing of probative value against incidental prejudice that is committed to the sound discretion of the trial judge and will not be overturned on appeal absent an abuse of discretion. *Id.*; *see also Satterfield v. Commonwealth,* 14 Va. App. 630, 635, 420 S.E.2d 228, 231 (1992) (en banc).

In this case, the evidence of Lafon's prior conduct established his intent, motive and premeditation to abduct and murder Mergler. Lafon argues that *Sutphin* requires both a significant similarity in the *modus operandi* of the acts and a close proximity in time between the prior act and the crime charged before prior bad acts evidence will be admitted to show guilty knowledge or intent. Lafon's argument oversimplifies the analysis the trial judge must undertake in determining the relevance and probative value of prior bad acts evidence.

In *Spencer,* the Supreme Court adopted the standard of the Seventh Circuit in *United States v. Hudson,* 884 F.2d 1016 (7th Cir. 1989), *cert. denied,* 496 U.S. 939 (1990), stating that the similarity between the crime charged and the prior conduct need not be one of identity so much as one of striking similarity. 240 Va. at 90, 393 S.E.2d at 616; *see also Witt v. Commonwealth,* 15 Va. App. 215, 221, 422 S.E.2d 465, 469 (1992). The *modus operandi* is not only the commission of similar crimes but the planning of similar crimes. *Ferrell v. Commonwealth,* 11 Va. App. 380, 387 n.5, 399 S.E.2d 614, 618 n.5 (1990). In this instance, the trial judge was permitted to determine that the sequence of events during 1986 which constituted the plan for a crime was sufficiently similar to the events alleged to have occurred in Mergler's disappearance and death to be probative of intent, motive and premeditation and admissible under those exceptions.

The Commonwealth had the burden of proving intent and premeditation to commit abduction and murder. If the events in 1986 showed

no more than a predisposition to commit violent acts, they would be inadmissible to prove the specific intent to commit a particular crime. We believe, however, that where prior bad acts resemble a "blueprint" for the crime charged, they show more than a predisposition to commit that type of crime. When the Commonwealth produces sufficient direct or circumstantial evidence to show the fruition of that blueprint into an actual crime, evidence of the prior bad acts is relevant and probative of intent and premeditation.

The probative value of this evidence was not defeated by its remoteness in time from the crime charged. We can distinguish cases relied on by Lafon where evidence of prior bad acts was ruled inadmissible, although much more proximate to the crime charged. In *Sutphin*, for example, there was no "signature" element to the prior crime; Sutphin's involvement in one break-in could not implicate him in any other break-in *regardless of how close in time the two crimes occurred.* The evidence was excluded because it was not factually relevant, without any consideration of its remoteness. Once factual relevance has been established, the trial court may consider remoteness as one of the factors in determining evidentiary relevance of prior bad acts evidence, but it should not withhold such evidence solely on the basis of remoteness unless the expanse of time has truly obliterated all probative value. This determination is committed to the sound discretion of the trial court. *Brown v. Commonwealth,* 3 Va. App. 182, 186, 348 S.E.2d 849, 852 (1986), *aff'd,* 238 Va. 213, 381 S.E.2d 225 (1989).

Thus the ultimate issue becomes whether such evidence of prior conduct was sufficiently connected in time and circumstances with the homicide as to be likely to characterize the victim's conduct toward the defendant. [*Randolph v. Commonwealth,* 190 Va. 256, 265, 56 S.E.2d 226, 230 (1949)]. Or stated alternatively, the test is whether the evidence of prior character is "so distant in time as to be void of real probative value in showing present character." 3A Wigmore, *Evidence* § 928, at 755 (Chadbourn Rev. 1970).

. . . *Once a nexus for relevancy of prior conduct or character has been established . . . the issue of remoteness concerns the weight of the evidence and the credibility of the witnesses, both of which are within the province of the jury.*

*Barnes v. Commonwealth,* 214 Va. 24, 26, 197 S.E.2d 189, 190-91 (1973) (emphasis added). In this case, fourteen months was not sufficient to erase all probative value and the trial court properly allowed the evidence to go to the jury, who were permitted to accord the appropriate weight to that evidence considering all factors, including its remoteness in time.

## II.
## THE LAY WITNESS OPINION ISSUE

■ Lafon also argues that the trial judge erroneously permitted Doug Jones to state his opinion on the ultimate question of Lafon's guilt, and that Sherry Roberts was permitted to testify to a prior consistent statement of Jones on that same issue.[1] As a general rule, opinion testimony of lay witnesses is incompetent because the jury is in as good a position as a witness to form opinions from the facts. Although the "opinion rule" is well settled law throughout the United States, it originated from a misinterpretation of English common law. *See, e.g.,* Edward W. Cleary, *McCormick on Evidence,* § 11 (3d ed. 1984). Accordingly, there are numerous exceptions to the rule that allow lay witnesses to express "opinions" in their testimony. *See* Charles E. Friend, *The Law of Evidence in Virginia* § 201 (3d ed. 1988).[2]

■ The principal exception to the "opinion rule" is the common sense understanding that the terms "fact" and "opinion" are relative. *Id.; see also* 31A Am. Jur. 2d *Expert and Opinion Evidence* § 9 (1988). Some statements are not mere opinions but are impressions drawn from collected, observed facts, and are admitted under the "collective facts rule." *Thomas v. Commonwealth,* 186 Va. 814, 819-20, 44 S.E.2d 365, 368 (1947), *rev'd on other grounds,* 187 Va. 265, 46 S.E.2d 388 (1948); *see also State v. Revere,* 572 So. 2d 117, 139 (La. Ct. App. 1990) (a natural inference or conclusion based on stated facts is not opinion evidence), *cert. denied,* 581 So. 2d 703 (La. 1991); *Dawson v. Casey,* 364 S.E.2d 43, 46 (W. Va. 1987) (citing with approval the use of the rule in Virginia). *See generally* 31A Am. Jur.

---

[1] The Commonwealth questions whether Lafon adequately preserved this issue for trial. Rule 5A:18. The record reflects that, on the several occasions during Jones's testimony, Lafon did not object to Jones making statement's about Lafon's guilt. Nonetheless, we find that when Lafon did object to Jones's and Roberts's testimony, the objections were sufficient to preserve this issue for appeal.

[2] The 1993 revision of Title 8.01 legislatively abrogated the "opinion rule" in civil proceedings. *See* Code § 8.01-401.3.

2d. *Expert and Opinion Evidence* § 10 (1988); 32 C.J.S. *Evidence* § 546(3) (1964). Thus, an "opinion" formed by a witness at a given time, may be a "fact" that explains why the witness acted in a particular way. Making this distinction is a question best left to the discretion of the trial judge. *See* 31A Am. Jur. 2d *Expert and Opinion Evidence* § 9 (1988).

Jones's statements, "I knew right then that [Lafon] had told me the truth," "I told [Roberts] that I knew who did it and that it was [Lafon]," and that he "put two and two together" upon hearing of the discovery of Mergler's body, are not overt expressions of opinion; rather they are each the final link in a chain of questions and answers which explain, respectively, why Jones first delayed going to authorities, why he confided in Roberts, and why he ultimately came forward to tell authorities what he knew. The facts that supported these conclusions were given to the jury, and the jury was free to make its own interpretation of those facts and accord the appropriate weight to Jones's actions resulting from his conclusions.

We find that each of the instances in which Jones commented on his personal belief in Lafon's guilt, he merely expressed a permissible impression drawn from observed facts that explained his actions. The trial judge was within his discretion in allowing these statements into the record.

█ Jones's statement on redirect examination ("They also asked me if [Lafon] was capable of doing something like this and I said yes") and Roberts's testimony corroborating Jones's testimony that he had confided in her about Lafon's statements to him were admitted after Lafon attempted to show that Jones had fabricated his testimony. The admission of prior consistent statements after an attempt is made to impeach a witness through a charge of recent fabrication is proper. *See Smith v. Commonwealth,* 239 Va. 243, 261, 389 S.E.2d 871, 880 (1990); *Skipper v. Commonwealth,* 195 Va. 870, 876-77, 80 S.E.2d 401, 405 (1954).

### III. UNCOUNSELED STATEMENTS TO A POLICE INFORMANT ISSUE

█ Lafon argues that once Jones agreed to become a police informant, Lafon was entitled to assistance of counsel when Jones engaged

him in conversation about Mergler's murder.[3] While acknowledging that the existing rules governing assistance of counsel do not support Lafon's claim of a violation of his rights, he invites this Court to recognize a limited exception to the holding in *United States v. Gouveia,* 467 U.S. 180, 188 (1984), that the Sixth Amendment right to counsel does not attach prior to initiation of adversarial proceedings. Specifically, Lafon asserts that where the Commonwealth identifies a principal suspect in its investigation, the suspect retains counsel, and the counsel notifies the Commonwealth of his desire to attend all interrogations of his client, secretly taped conversations between a police agent and the suspect should not be used against the suspect in a subsequent prosecution.

In *Gouveia,* the Supreme Court reaffirmed its position that the Sixth Amendment right to counsel does not attach prior to initiation of adversarial proceedings. *Id.* at 188. The Court has also recognized a suspect's need to have counsel present during in-custody conversations with government informants. *See United States v. Henry,* 447 U.S. 264, 274 (1980) (defendant's Sixth Amendment right to counsel was violated by a police informant, who shared a cell with the defendant, eliciting statements without the suspect's attorney being present).[4] However, in *Kuhlmann v. Wilson,* 477 U.S. 436 (1986), the Court held that a Sixth Amendment violation does not occur when the government places an informant in the accused's cell and the informant remains passive. *Id.* at 459. In *Wilson,* the Court distinguished between active and passive behavior on the part of the informant. By inquiring beyond the government's actions and into the nature of the informant's actions, the Court in *Wilson* favored the societal goal of effective law enforcement. See April Leigh Ammeter, Comment, *Kuhlmann v. Wilson: "Passive" and "Active" Government Informants—A Problematic Test,* 72 Iowa L. Rev. 1423 (1987).

---

[3] The Commonwealth correctly states that Lafon argues a different perspective on the right to counsel issue on appeal than was raised below. The suppression motion was based on Lafon's "Fifth Amendment" assertion through his retained counsel that he wished to have counsel present during interrogations. However, during the hearing on the motion, the Commonwealth acknowledges that Lafon "want[ed] to argue some sort of Sixth Amendment right to counsel." We believe that the nature of his motion *in limine* and the evidence and argument adduced at the hearing on that motion create a colorable issue to address on the merits.

[4] In *Henry* and its progeny there was no assertion that the conversations between informants and suspects amounted to interrogations triggering the Fifth Amendment right to counsel. Although Lafon initially asserted a Fifth Amendment right, it is now conceded that the conversations between Lafon and Jones did not occur in an in-custody setting; therefore, Lafon is not entitled to Fifth Amendment protection.

In *Maine v. Moulton,* 474 U.S. 159 (1985), the Court addressed the issue of whether an accused's Sixth Amendment right to counsel was violated by the admission into evidence of incriminating statements made by the accused to a co-defendant, a secret government informant, at a pre-arranged meeting where the two convened to plan a trial strategy after their indictment. *Id.* at 161. The Court held that a suspect's right to counsel was violated when the government deliberately elicited incriminating statements from the suspect by "knowingly circumventing [his] right to have counsel present" during confrontations between the accused and an undercover agent of the State. *Id.* at 176.

We distinguish the present case from *Henry* and *Moulton* on several grounds. First, in both cases, the right to counsel had already attached through the initiation of adversarial proceedings. Second, unlike the present case, the informants in *Henry* and *Moulton* pursued their own self-interests; Jones was not a jail-house informant, but a private citizen assisting police.[5] Finally, in *Henry,* and to a certain extent in *Moulton,* the informant initiated the contact with the suspect after becoming police operatives; here, Lafon approached Jones and unburdened himself long before Jones became a police operative.

There is some support for Lafon's assertion that the Sixth Amendment right is not exclusive to post-arrest adversarial proceedings:

> Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—"whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams,* 430 U.S. 387, 398 (1977) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S. Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion)). *That statement . . . does not foreclose the possibility that the right to counsel might under some circumstances attach prior to the formal initiation of judicial proceedings. . . .*

---

[5] We do not suggest that the police may avoid constitutional restrictions by employing citizen informants in all circumstances. We simply recognize that one of the concerns in using jail-house informants is reliability, a factor of less concern when the motives of the informant are more salutary.

*Gouveia,* 467 U.S. at 193 (Stevens, J., concurring) (emphasis added). However, we do not believe that this case presents the appropriate facts and circumstances to advance the right to counsel beyond the scope provided for by the majority in *Gouveia.*

Lafon's assertion that "principal" suspects should have a right to counsel presents the troubling question of defining a "principal suspect." In this instance, Lt. Stables was following up a current lead and recruited Jones to assist in that investigation; this is such a common means of police investigation that to accept Lafon's position we would have to extend the right to counsel to any suspect in whom police had a credible suspicion.

Moreover, the fact that Lafon had retained counsel and that counsel had requested that he be present during interrogations is not relevant. While affirmative steps to exercise the right to counsel may bar the use of statements from uncounselled, custodial interrogations under the Fifth Amendment, such steps have no application to a situation where the right to counsel under the Sixth Amendment has not attached. Lafon cannot create a Sixth Amendment right by asserting that he is exercising his Fifth Amendment right.

██ We find the issue presented here indistinguishable from that in *Hummel v. Commonwealth,* 219 Va. 252, 247 S.E.2d 385 (1978), *cert. denied,* 440 U.S. 935 (1979), where our Supreme Court held that the Sixth Amendment right to counsel does not attach during the investigation of a crime, even when the suspect has retained counsel. *Id.* at 256-57, 247 S.E.2d at 388. Accordingly, Lafon had no right to counsel during his conversations with Jones.

## IV. SUFFICIENCY OF EVIDENCE TO PROVE ABDUCTION ISSUE

Finally, Lafon contends that the evidence adduced at trial is insufficient to sustain his conviction for simple abduction.[6] Lafon was convicted of abduction as a lesser included offense of abduction with intent to defile. Code § 18.2-47 defines abduction as follows:

> Any person, who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains

---

[6] The Commonwealth notes that in renewing his motions at the close of trial, Lafon neglected to renew specifically his motion to strike, foreclosing his right to challenge the sufficiency of the evidence on appeal. Because the exchange between the trial judge and Lafon's counsel concerning renewal of motions is ambiguous, we elect to address this issue on its merits.

or secretes the person of another, with the intent to deprive such other person of his personal liberty or to withhold or conceal him from any person, authority or institution lawfully entitled to his charge, shall be deemed guilty of "abduction". . . .

██ Lafon argues that the sole evidence that he abducted Mergler was that she disappeared from Blacksburg and was at some later time murdered in Giles County and that these facts do not in themselves exclude the possibility that Mergler left Blacksburg voluntarily. We disagree. Circumstantial evidence sufficient to support the jury's finding was presented at trial.

> When considering the sufficiency of the evidence on appeal of a criminal conviction, we must view all the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom. The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it.

*Traverso v. Commonwealth,* 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988) (citations omitted). In a case based upon circumstantial evidence, the Commonwealth must exclude every reasonable hypothesis of innocence. *Cantrell v. Commonwealth,* 7 Va. App. 269, 289, 373 S.E.2d 328, 338 (1988), *cert. denied,* 496 U.S. 911 (1990). However, "[w]hether the Commonwealth relies upon either direct or circumstantial evidence, it is not required to disprove every remote possibility of innocence, but is, instead, required only to establish guilt of the accused to the exclusion of a reasonable doubt." *Id.* (quoting *Bridgeman v. Commonwealth,* 3 Va. App. 523, 526-27, 351 S.E.2d 598, 600 (1986)).

The evidence viewed in the light most favorable to the Commonwealth adduced the following circumstances: Mergler lived in the Stonegate Apartments, within sight of the Terrace View Apartments where Lafon talked about abducting and killing a college girl the previous year. Mergler was last seen at the hotel lounge where she and several friends had gone for an after-dinner drink. Mergler did not have a car and was depending on her friends to drive her back to her apartment, some two miles from the hotel.

Mergler disappeared less than eight hours before she was scheduled to leave Blacksburg for Northern Virginia. She had arranged her affairs in Blacksburg and reconfirmed her plans for the trip shortly before her disappearance. When she telephoned Ann Ryan only a few

hours before her disappearance, Mergler stressed her desire to get an early start on the following morning.

Family and friends testified that Mergler would not normally remain out of communication with her family or fail to inform them of a change of plans. "[A] jury may properly take into account the unlikelihood that an absent person, in view of [her] health, habits, disposition, and personal relationships would voluntarily . . . remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence." *Epperly v. Commonwealth*, 224 Va. 214, 228-29, 294 S.E.2d 882, 890 (1982).

In this case, the circumstantial evidence is sufficient to exclude all reasonable hypotheses of innocence. The Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant. *Cook v. Commonwealth,* 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983); *Fordham v. Commonwealth,* 13 Va. App. 235, 239, 409 S.E.2d 829, 831 (1991). Although no one actually saw Lafon accost or abduct Mergler, the circumstantial evidence, viewed in the light most favorable to the Commonwealth, was sufficient to justify the jury's conclusion that Mergler would not voluntarily have travelled to Giles County or otherwise accompanied Lafon willingly. While it is possible to envision a myriad of scenarios in which Mergler voluntarily went to Giles County, or was abducted by someone other than Lafon, there is simply no evidence in the record to support such speculation. "Hypotheses not flowing from the evidence must be rejected." *Fordham,* 13 Va. App. at 239, 409 S.E.2d at 831. Accordingly, we cannot say that the jury's conclusion is plainly wrong.[7]

For the foregoing reasons, we reject each of Lafon's arguments for reversing his convictions, and, accordingly, the judgment appealed from is affirmed.

*Affirmed.*

Elder, J., and Fitzpatrick, J.

---

[7] The fact that the jury chose to convict on only the lesser included offense of simple abduction further persuades us that their action was neither precipitous nor ruled by inflamed emotion. The jury clearly considered the trial court's instruction on the elements of the offenses and looked to the evidence in reaching its verdict.